LAW OFFICES
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6000

1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

ATTORNEYS FOR DEFENDANTS

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARMELO MILLAN, individually, and on Behalf of All Other Persons Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CITIGROUP, INC., <br> CITIGROUP TECHNOLOGY, INC. <br><br> Defendants. | Civil Action No. 07-CIV-3769 <br><br> *Electronically Filed* <br> *Redacted Version, Full Version* <br> *Filed Under Seal* |

**LOCAL RULE 56.1 STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendants Citigroup Inc. and Citigroup Technology, Inc. ("CTI"), by and through their attorneys, Morgan, Lewis & Bockius LLP, hereby submit this Local Rule 56.1 Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the Southern District of New York, and the individual rules of this Court.

**Citigroup Technology, Inc.**

1.  Citigroup Technology, Inc. ("CTI") is a wholly-owned subsidiary of Citigroup Banking Corporation, which is a wholly-owned subsidiary of Citigroup Inc. (Answer ¶9).

2.  Plaintiff worked for CTI from June of 2000 when he commenced his employment, through March of 2007, when he voluntarily resigned. (Complaint ¶26; Ex. A at 27:2-30:16)[1].

3.  Citigroup Inc. has never employed Plaintiff, and specifically, it has never had the power to hire or fire Plaintiff or control his work schedule and conditions of employment. (Ex. B at 69:7-13, 91:21-92:3, 111:15-18, 121:6-9, 130:18-21, 150:1-10; Ex. C at 12:16-13:2, 16:22-17:3, 20:20-21:9, 25:16-23, 32:6-10, 88:13-89:1).

4.  CTI had the sole power to hire and fire Plaintiff, as well as control his work schedule and conditions of employment. (Ex. B at 69:7-13, 91:21-92:3, 111:15-18, 121:6-9, 130:18-21; Ex. C at 12:16-13:2, 16:22-17:3, 20:20-21:9, 25:16-23, 32:6-10, 88:13-89:1).

5.  In addition, CTI paid Plaintiff's salary and bonuses. (Ex. B at 150:1-10; Ex. C at 176:10-177:7). While employed by CTI, CTI never paid Plaintiff less than $455 per week. (Ex. A at 120:1-121:15, Dep. Exs. 9-10).

6.  **REDACTED – FULL VERSION FILED UNDER SEAL.**

7.  **REDACTED – FULL VERSION FILED UNDER SEAL.**

8.  **REDACTED – FULL VERSION FILED UNDER SEAL.**

9.  CTI maintained one of its lab facilities at 388 Greenwich Street, New York, New York ("Greenwich Lab"). (Ex. A at 9:14-20). Plaintiff worked at the Greenwich Lab location for approximately five years. (Complaint ¶16; Ex. A at 13:10-13, 31:13-16).

---

[1] As used in this statement, the exhibit numbers in the Statement of Undisputed Material Facts correspond to the exhibit numbers in the Affidavit of Sarah E. Pontoski.

10. Beginning in 2005, CTI migrated its 388 Greenwich Lab to a new lab in Warren, New Jersey ("Warren Lab"). (Ex. A at 31:13-16). Plaintiff worked at the Warren Lab from 2005 through March 14, 2007, when he voluntarily resigned from CTI. (Complaint ¶26).

11. In addition to maintaining lab environments for development and testing, CTI also provides network connectivity services to Citi[2] and its various businesses and end users. (Ex. A at 22:2-5).

### Plaintiff's Job Duties And Qualifications As An Analyst

12. Plaintiff commenced his employment with CTI as a telecommunications analyst ("Analyst") providing CTI network connectivity services to Citi end users. (Complaint ¶26). Richard Braunagel and Thomas Saranello supervised Plaintiff while he was an Analyst. (Ex. A at 18:8-15).

13. Plaintiff was required to have proficient knowledge of cabling and wiring configurations to perform his Analyst duties. (Ex. B at 40:14-24). Many CTI Analysts also have cabling certifications, including the CISCO Interconnecting CISCO Network Devices ("ICND"). (Ex. B at 142:13-18).

14. Plaintiff had a CISCO ICND certification. (Ex. A at Dep. Ex. 1). The ICND, or interconnecting CISCO network devices, certifies that an individual has important knowledge and skills necessary to select, connect, configure, and troubleshoot the various Cisco networking devices. (Ex. H).

---

[2] As used in this statement of material facts, "Citi" refers to Citigroup Inc., its subsidiaries and their affiliates.

15.     In addition, Plaintiff had a CISCO Certified Network Associate ("CCNA") certification, which is an advanced networking certification. (Ex. A at Dep. Ex. 1). The CCNA certification validates an individual's "ability to install, configure, operate and troubleshoot medium-sized routed and switched networks, including implementation and verification of connections to remote cites in a [Wide Area Network]." (Ex. I).

16.     While an Analyst, Plaintiff's supervisors gave him significant leeway to utilize his knowledge of cabling and networking to self-manage assignments and perform them with little to no input from his supervisors. (Ex. B at 114:23-115:4).

17.     As an Analyst, Plaintiff ensured that end users were properly connected to the network. Plaintiff also handled the network connectivity and software checkout aspects of Moves, Adds and Changes to the company network. (Ex. B at 42:16-21, 49:2-17, 55:23-56:7; Ex. A at 21:23-22:10, Dep. Ex. 1).[3]

18.     In addition, as an Analyst, Plaintiff created and implemented Salt & Peppering schemes to provide desktop, server and network redundancy. (Ex. A at Dep. Ex. 1).

19.     Specifically, Plaintiff's responsibilities included aggressively monitoring, managing and resolving end users' connectivity problems. (Ex. A at 82:22-83:2, Dep. Ex. 1). Plaintiff conducted proactive internal/external escalation, trouble ticketing, and reporting for 38 floors in a mixed Dynamic Host Configuration Protocol ("DHCP")/statis, 10/100 switched Ethernet, gigabit backbone environment. (Ex. A at Dep. Ex. 1).

---

[3] Notably, Plaintiff testified that his resume accurately reflects his duties at CTI. (Ex. A at 16:13-17).

20.     Furthermore, Plaintiff worked with Network Operations, Engineering, Integration, as well as company business units in diagnosing, troubleshooting and resolving company-wide network problems.  (Ex. A at Dep. Ex. 1).

21.     Part of his Analyst duties also included testing different media types with different testing devices, including but not limited to butt sets, fiber testers, Mod-Taps, and Fluke meters.  (Ex. A at Dep. Ex. 1).  Specifically, when an end user indicated that he or she could not connect to the network, Plaintiff utilized these testing devices to trouble-shoot and test a user's connectivity.  (Ex. A at 79:18-23).

22.     Because CTI is responsible for ensuring connectivity to networks for thousands of end users, it is essential that all connectivity is properly documented.  If and when a problem arises with a user's connectivity, the Analyst will only be able to effectively assess the problem by referring to integrated documentation to troubleshoot the connectivity problem.  Without accurate connectivity documentation, significant delays could occur, which risk impacting the business operations in a significant and meaningful way.  (Ex. B at 80:4-81:22, 154:16-155:9; Ex. A at 81:20-82:16, Dep. Ex. 1).

23.     **REDACTED – FULL VERSION FILED UNDER SEAL.**

24.     As an Analyst, Plaintiff was also responsible for preparing complete documentation of the connectivity of all devices that he connected to the network.  (Ex. B at 80:4-81:22, 154:16-155:9; Ex. A at 81:20-82:16, Dep. Ex. 1).  Specifically, Plaintiff was responsible for the creation, maintenance and, most importantly, accuracy of all network connectivity related databases/worksheets.  (Ex. A at Dep. Ex. 1).

25.     These duties of Plaintiff's were critically important. Without proper connectivity documentation, an Analyst cannot properly and efficiently troubleshoot connectivity problems. (Ex. B at 154:16-155:9; Ex. A at 82:5-12).

26.     As an Analyst, Plaintiff was also responsible for disconnecting unused ports (a piece of equipment that is utilized to connect a device to a server to establish connectivity) from the network and maintaining connectivity to ports in use by end users. (Ex. B at 24:23-25:2, 33:19-24, 49:2-17). In order to ensure port connectivity, Plaintiff was required to understand virtual local area network ("LAN") configuration and how to match a network address to a port. (Ex. B at 33:25-34:6).

27.     Plaintiff determined whether there was proper connectivity to a port by telneting to the port switch and establishing a session from an attached computer through an IP address. (Ex. B at 34:22-35:1). By telneting, Plaintiff could turn the port on or off and/or change the virtual LAN configuration to ensure connectivity of a device to the network. (Ex. B at 35:2-36:6; 49:2-17).

28.     As an Analyst, Plaintiff also worked on build-outs – the remodeling or reconfiguration of a lab. (Ex. A at 81:3-17, 95:8-96:5). As part of a lab build-out, Plaintiff provided network connections and tested connections, to ensure that the lab worked properly for those persons moving within or into the lab. (Ex. A at 81:3-17; Ex. D).

29.     When CTI moved, added or changed end users in connection with a build-out, Plaintiff took steps to ensure that after the move, add or change the end users had proper connectivity to the network. These steps included: ensuring the availability of sufficient network capacity; determining how many ports were available to utilize to connect users to the network; surveying port capacity; submitting changes to reconfigure ports; and engaging the network

integration team to assist with ensuring proper port capacity and configuration. (Ex. B at 24:21-25:15, 49:2-17; Ex. A at 81:3-17).

30.     In connection with a move, Plaintiff attended meetings with project managers and engineers so that he could provide valuable insight into the type of cables and the port capacity needed to ensure that after the move, add, or change, all end users were properly connected to the system. (Ex. B at 117:6-17).

31.     For example, as an Analyst, Plaintiff looked at the number of people on the floor, and the number of devices that the project managers wanted to install on the floor to determine whether there were enough ports to accommodate the plan and whether the project manager had specified the correct cable to establish connectivity. (Ex. B at 24:23-25:6).

32.     Certain cables only function properly for certain distances, so as an Analyst, Plaintiff measured the distance from the router (the place where the network begins) to the switch (the place where the device is installed) with a micro scanner to ensure that the cabling equipment that the project manager wanted to purchase could establish connectivity. (Ex. B at 67:1-12).

33.     In order to create connectivity, Plaintiff installed multiple cables between multiple junctions. Plaintiff was required to understand how the multiple pieces of cable fit together for connectivity purposes so that he could advise the project manager regarding the type of cable to purchase. (Ex. B at 37:12-38:3, 40:14-41:9, 42:10-44:18, 49:13-17).

34.     If necessary, after the plans for the move were complete, Plaintiff added port capacity, configured any new ports, ensured that the proper cables were installed to provide connectivity to the network, tested the cabling and ports to ensure proper connectivity to the

network, and documented the cabling. (Ex. B at 24:21-25:15, 42:10-21, 49:2-17; 68:19-69:3; Ex. A at 84:8-24).

35.  More specifically, Plaintiff was the lead Analyst in the Human Resources restack (relocation or move of a CTI department), which involved the relocation of one-hundred and forty one (141) users from various metro sites to the Greenwich Lab. (Ex. B at 123:4-18, Dep. Ex. 3). Plaintiff was also the lead Analyst in the Stock Plan Services, E-Business and General Services restacks. (Ex. B at Dep. Ex. 3).

36.  As an Analyst, Plaintiff also performed installation and activation work in the Data Center. (Ex. B at 21:13-16, 49:2-17; Ex. A at Dep. Ex. 1). The Data Center is and was CTI's central point for communications and the distribution of voice and data services. It houses network routers, switches and circuits. (Ex. B at 21:7-11).

37.  As part of his work in the Data Center, Plaintiff performed server installations, which involved coordinating with system administration and engineering to ensure proper placement of servers and cabling in the Data Center and to ensure that the servers were connected to the correct network segment. (Ex. B at 21:20-22:7, 54:4-14, 64:19-69:6; Ex. A at Dep. Ex. 1).

38.  In connection with his work in the Data Center, after an engineer created an initial plan, Plaintiff consulted with the engineer regarding cable specifications and measurements. (Ex. B at 21:20-22:7, 54:4-14, 64:19-69:6). In the event that engineers specified the wrong type of cable, or attempted to connect a device to the network through a port that was too far away from the device, and it was Plaintiff's responsibility to identify such errors and to correct those specifications. (Ex. B at 21:20-22:7, 54:4-14, 64:19-69:6).

39.  As an Analyst, Plaintiff utilized his knowledge of cabling to ensure that the engineering plans reflected the use of the correct type of cable and the attachment of servers and devices to the correct ports. (Ex. A at 85: 5-19). Plaintiff's collaboration with engineers enabled CTI to ensure quality assurance of the engineering design. (Ex. B at 22:1-7).

40.  Specifically, Plaintiff took the engineer's plan and analyzed the facility where the engineer planned to install a new server to ensure that the engineer's plan did not exceed the cooling and power requirements or the distance limitations for cabling. (Ex. B at 65:7-22). Plaintiff also ensured that none of the cables that the engineers intended to use interfered with one another because when cables interfere with one another, they typically impair connectivity. (Ex. B at 68:5-14).

41.  Plaintiff also reviewed requests from engineers, consulted with engineers, submitted network changes, and ensured that ports were properly configured. (Ex. B at 21:20-22:24; Ex. A at 84:11-85:19). Once Plaintiff configured the port, he would engage in network testing to ensure that he had the proper network connectivity by completing virtual LAN configurations. (Ex. B at 25:7-15, 33:23-35:21).

42.  In connection with port configurations, Plaintiff was responsible for managing network capacity – proactively ensuring that there is always port capacity so that when CTI needed to add another user, it had proper capacity. (Ex. B at 29:13-30:4). When a port was no longer in use, Plaintiff used his knowledge and expertise to disable the port by implementing changes to the network. (Ex. B at 30:21-33:21).

43.  As an Analyst, Plaintiff utilized his advanced knowledge of networking and his CCNA certification in connection with his work in the Data Center. (Ex. B at 142:15-18; Ex. A at 84:11-17). To complete his job as an Analyst, Plaintiff was required to understand CISCO

9

IOS, the operating system for CISCO equipment, so that he could adequately set port speeds on switches and adjust the ports, after establishing connectivity to a network. (Ex. A at 54:14-17, 84:11-17)

44.     Plaintiff also installed and upgraded network related devices, CISCO Adtran CSU (high-performance equipment designed to support a wide range of end-user applications), multiple CISCO routers and switches, probes, cabling and servers. (Ex. A at Dep. Ex. 1; Ex. B at 57:20-23).

45.     As an Analyst, Plaintiff also showed initiative to address compliance related issues at the Greenwich Lab, including successfully organizing and articulating procedures for CTI's annual continuity of business test, also known as the disaster recovery plan ("COB test"). (Ex. A at Dep. Ex. 5; Ex. B at Dep. Ex. 5). The COB test, which Plaintiff worked on directly with a CTI compliance officer, outlined evaluation procedures, contact lists and application testing procedures to ensure that the unit would function in the event of a disaster. (Ex. B at 89:17-20, 90:8-10, 93:11-15, 94:5-19).

46.     Plaintiff also showed initiative to address all TRAM (back-office computer system) related issues. (Ex. B at Dep. Ex. 5). In addressing all COB and TRAM related issues, Plaintiff provided input and suggestions directly to his superiors and compliance officers. (Ex. B at 89:17-20, 90:8-10, 93:11-15, 94:5-19, Dep. Ex. 5).

47.     In his role as an Analyst, Plaintiff was also responsible for the maintenance of the Process Control Manual ("PCM"). (Ex. A at 89:17-23). In connection with maintaining the PCM, Plaintiff mapped the different systems that CTI used to establish connectivity and made revisions when a system changed. (Ex. A at 89:17- 92:4). CTI used the PCM not only to document its policies and procedures, but also to train new Analysts. (Id.).

48.     Plaintiff used his discretion to determine whether to make a revision to the PCM when a system changed. (Id.; Ex. B at 89:8-12).

49.     Millan also attended compliance meetings to ensure that his group utilized the correct policies and procedures and to assist his group in completing risk self assessments and completed the risk self assessment for his group. (Ex. B at 89:17-20, 90:6-10, 93:11-15, 94:5-19, 115:15-116:5).

**Plaintiff's Job Duties And Responsibilities As Lab Coordinator**

50.     CTI employed Plaintiff as an Analyst until it promoted him to Lab Coordinator for Global Network Engineering / Control in December of 2003.[4] (Ex. A at Dep. Ex. 6). After he was promoted, Plaintiff worked as a Lab Coordinator at the Greenwich Lab. (Ex. A at 18:16-18).

51.     Paul Holder ("Holder") supervised Plaintiff while Plaintiff was employed by CTI as a Lab Coordinator in the Greenwich Lab. (Ex. A at 18:16-18; Ex. C at 78:16-79:7, 80:2-5).

52.     Amedeo Discepolo loosely supervised Plaintiff while he was a Lab Coordinator in the Greenwich Lab and Warren Lab. (Ex. A at 46:23-24, 53: 12-15; Ex. B at 55:22-57:15; Ex. C at 80:17-22). Initially, Discepolo did not directly supervise Plaintiff in the Warren Lab, Paul Holder directly supervised Plaintiff. (Ex. C at 78:16-79:7). During this time, Discepolo only spoke to Plaintiff when he needed key updates regarding the design of the Warren Lab. (Id. at 80:17-22). Eventually, due to a reorginization, Discepolo directly supervised Plaintiff, and he held weekly meetings with Plaintiff. (Ex. G).

53.     When the lab migrated to Warren, New Jersey, Plaintiff was located in Warren, New Jersey, while Discepolo was located in Melville and Uniondale, New York. (Ex. B. at

---

[4]     The parties have agreed to stipulate to the date of Plaintiff's promotion.

11

55:22-57:5). When the lab was located on Greenwich Street, Plaintiff and Discepolo were located on different floors in the facility. (Ex. A at 53:12-15; Ex. C at 57:6-15). Plaintiff's duties and responsibilities as Lab Coordinator were the same at the Greenwich Lab as they were at the Warren Lab, and they were the same under Paul Holder, as they were under Amedeo Discepolo. (Ex. C at 74:2-23, 78:24-79:24; Ex. A at Dep. Exs. 3, 6-7[5]).

54.     In 2005 through 2006, Plaintiff was the Lab Coordinator who was primarily responsible for the migration of the Greenwich Lab to Warren, New Jersey. (Ex. A at Dep. Exs. 3, 6-8; Ex. C at 81:21-82:4). Initially, in this capacity, Plaintiff not only continued completing his day-to-day activities, but also assumed responsibility for the build-out of the Warren Lab. (Ex. A at 47:2-48:4, Dep. Ex. 3). Then, Plaintiff helped to train a new member of the Lab Coordination team to perform the day-to-day functions of the lab so that he could focus primarily on the lab migration. (Ex. A at Dep. Exs. 6-8; Ex. C at 87:3-8).

55.     **REDACTED – FULL VERSION FILED UNDER SEAL.**

56.     Plaintiffs' certifications and knowledge of networking benefited him in the performance of his Lab Coordinator duties. (Ex. C at 123:23-124:8). The lab migration allowed Plaintiff to "utilize many of his skills and technical knowledge" and to also "enhance his project management, task prioritization and organizational skills." (Ex. A at Dep. Ex. 7). Because the Lab Coordinator position required him to take on a significant amount of responsibility, CTI asked Plaintiff to attend a time management class so that he could adequately handle his new responsibilities. (Ex. C at 89:1-15).

---

[5]     Plaintiff's key job responsibilities as noted on his year-end performance review in 2004 when he was reporting to Holder were the same as his key job responsibilities noted on his year-end performance review in 2005 when he was reporting to Holder and Discepolo. (Compare Ex. A at Dep. Ex. 3 with Ex. A at Dep. Ex. 7).

57.     Plaintiff utilized his prior experience to perform multiple roles in connection with the lab migration. Specifically, Plaintiff stated that he had complete responsibility of the move from "end to end," and he was able to "[d]raw on his experience…to perform multiple roles in the Lab Migration Project…project manager, infrastructure technician, datacenter management, and network integration." (Ex. A. at Dep. Ex. 7).

58.     Plaintiff's supervisors relied on him to gauge what steps to take to ensure that the lab migrated from the Greenwich Lab to the Warren Lab in a timely and orderly manner. (Ex. A at 46:23-47:7). Plaintiff acknowledged that in connection with his duties and responsibilities as a Lab Coordinator, he needed to "act like a professional" to ensure that the work was completed. (Ex. A at 111: 20-22).

59.     Plaintiff testified that, "[t]he lab needed to move to Warren. I supported the lab, right. The lab wasn't going to move if I didn't help them do it, right." (Ex. A at 47:24-48:4).

60.     After designing a plan for the layout of Warren, Plaintiff created specifications for the lab, and he provided the specifications to a project manager. (Ex. A at Dep. Ex. 1; Ex. C at 81:21-82:4). Specifically, Plaintiff developed the plan for the lab migration and worked directly with the engineers so that he could understand all of the equipment that was going into the lab from multiple disciplines. (Id.).

61.     Plaintiff designed and developed the floor layouts and designed the cabinet or infrastructure within the lab. (Ex. C at 82:18-83:5, 183:5-16). He completed this design by utilizing Microsoft Projects to identify all of the major deliverables and tasks associated with the lab migration, and he laid out or configured the Warren Lab space and all of its connectivity. (Id. at 81:21-82:14, 82:23-83:2, 85:11-22). As his supervisor aptly stated, the lab migration was "his game to win. It was all his." (Id. at 82:3-4).

62.  In connection with the migration, Plaintiff had an engineer assigned as a coordinator from each engineering discipline that migrated into the Warren Lab, and he gathered information from these individuals regarding inventory. Plaintiff utilized his experience to ask the engineer coordinators proper questions so that he could ensure that he procured the proper equipment for future installation. (Ex. C at 83:22-84:20).

63.  Plaintiff also communicated detailed instructions to these engineers regarding tasks that needed completion before the five major Citi Global Engineering Labs could migrate to the Warren Lab. (Ex. E; Ex. A at Dep. Ex. 1).

64.  In addition to designing the lab, as part of the migration, Plaintiff built the network infrastructure to firewall the Warren Global Engineering ("GE") Lab from Citi's production network. (Ex. A at Dep. Ex. 7).

65.  **REDACTED – FULL VERSION FILED UNDER SEAL.**

66.  As Lab Coordinator, Plaintiff helped to develop this new network by placing orders for equipment, installing the network, configuring the network, and ensuring that devices were properly connected. (Ex. A at 35:8-36:1, Dep. Ex. 1; Ex. C at 33:8-34:16, 86:5-14).

67.  In connection with his design of the new lab, it was Plaintiff's job to ensure that all GE disciplines remained fully viable after the lab moved to Warren. (Ex. A at Dep. Ex. 7). For example, Plaintiff was responsible for gathering all the technical requirements from all GE disciplines to ensure that these groups would not lose any functionality / productivity when they moved to the Warren Lab. (Id.).

68.  In completing the lab migration, Plaintiff created a "model lab," and his experience migrating the lab helped him to cope with the increased responsibility that he faced when the lab moved to Warren. (Ex. A at Dep. Ex. 7).

69.     Specifically, during the lab migration, Plaintiff provided his supervisor, Holder, with input regarding port capacity. (Millan Dep. at 36:16-37:2). Input regarding port capacity included determining the amount of network ports needed to house the Warren Lab as well as accounting for the capacities for the different groups within Warren. (Ex. A at 36:16-37:2 Dep. Ex. 1).

70.     Plaintiff's key job responsibilities as Lab Coordinator also included management of network connectivity, implementation, integration and troubleshooting for servers, routers and storage devices in the Warren Lab. (Ex. A at Dep. Ex. 1). In fact, other CTI professionals sought Plaintiff's advice regarding connectivity and servicing issues in the Warren Lab. (Ex. F).

71.     As a Lab Coordinator, Plaintiff provided critical services to the engineering community. He insured that everything in the lab worked properly, and if it did not work, he used his discretion to aggressively trouble shoot the problem. (Ex. C at 40:1-15, 70:23-71:7; Ex. A at Dep. Ex. 1). In connection with his provision of these services, he determined the placement and power provisioning of servers, network and storage devices for installation in the Warren Lab. (Ex. A at Dep. Ex. 1).

72.     In addition, Plaintiff staged and prepared all CTI test environments by evaluating all incoming testing efforts, building the proper environment, and/or engaging the proper engineering discipline to assist in the test efforts in the Warren Lab. (Ex. A at Dep. Exs. 1 & 3). Specifically, Plaintiff ensured that all CISCO switches and routers were properly configured to the correct cards, loaded the configured files onto the network, and utilized test equipment to ensure reliability of cabling and connectivity. (Ex. C at 77:22-78:7; Ex. A at Dep. Ex. 1).

73.     As a Lab Coordinator at the Warren Lab, Plaintiff not only interfaced with roughly four hundred (400) engineers with testing and implementation, but he was also a central

15

point person in the lab. He analyzed requests and determined who the proper person was to address the engineer's issues. (Ex. A at 33:4-15; Ex. C at 151:8-152:5).

74.     Plaintiff "maintain[ed] good working relationships with representatives from eight different engineering disciplines whose requirements and priorities often contradict[ed] each other," and through these relationships, Plaintiff provided his insights and decision-making authority not only to those within CTI but those outside CTI. (Ex. A at Dep. Ex. 3).

75.     During his employment, Plaintiff stated that he "actively request[ed] feedback from the Engineering community and tr[ied his] best to utilize feedback to make everyone's life easier. Proactive efforts to address lab issues [were] always being made and the lab team [was] always trying to improve lab efficiency, stability, and delivery." (Ex. A at Dep. Ex. 7).

76.     Plaintiff also coordinated all product development lab activities for CTI's Warren Lab. (Ex. A at Dep. Ex. 3). For example, Plaintiff evaluated different vendor products to determine if they could improve the efficiency of the lab. (Ex. A at Dep. Ex. 3).

77.     Plaintiff also ordered and installed networking gear, servers and lab supplies for the Warren Lab. (Ex. A at Dep. Ex. 1). He performed installations of the latest technology equipment for testing in the Lab/Development center. (Id.). Specifically, Plaintiff received new equipment and connected the equipment through intricate cables and configured the equipment to the network and lab infrastructure. (Ex. C at 49:6-51:3, 51:20-52:15; Ex. A at Dep. Ex. 1).

78.     Plaintiff engaged in system analysis techniques in connection with the installation of new equipment in the lab when he reviewed lab request forms submitted by engineers to ensure that he had all of the information necessary to service the engineer's request and that the request met CTI compliance standards. (Ex. C at 58:17-59:9, 61:3-17, 182:14-183:1). In addition, if an engineer requested multiple additional network connections to a server, Plaintiff

16

would ensure that there was proper port capacity and cable capacity to implement those network connections. (Id. at 60:5-18).

79.     Plaintiff also "worked with vendors and engineers to determine equipment environment requirements prior to on-site delivery of the equipment.' (Ex. A at Dep. Ex. 1). Following installation of the equipment, Plaintiff remained responsible for monitoring power consumption, environmental issues and change control activities in the Warren Lab. (Ex. A at Dep. Ex. 1; Ex. C at 156:15-157:10).

80.     Plaintiff also monitored the lab environment by monitoring access to the lab. (Ex. B at 150:14-151:5).

81.     In addition, while a Lab Coordinator, Plaintiff was responsible for tracking and documenting all evaluation equipment utilized and connected in the Greenwich Lab, and later, the Warren Lab. (Ex. A at 99:20-102:2, 130:23-131:2, . Exs. 1 & 3; Ex. C at 35:1-11, 69:8-23). In connection with these responsibilities, Plaintiff designed databases that CTI used and continues to use to track inventory in the Warren Lab and to document connectivity. (Ex. C at 180:12-182:10). Plaintiff used the connectivity database to document all the devices that came into the Warren Lab for installation. (Ex. A at 99:20-102:2, Dep. Ex. 1).

82.     **REDACTED – FULL VERSION FILED UNDER SEAL.**

83.     Plaintiff also provided his input for the development of lab policies to those within CTI and those outside CTI. (Ex. A at Dep. Ex. 1). Specifically, Plaintiff "[p]rovided input for Development Data Center policies and communicated them to [CTI] engineers, team, internal staff, business units and vendors." (Id.).

84.     In connection with his responsibilities as Lab Coordinator, Plaintiff relied upon his prior experience maintaining the PCM as an Analyst to create and maintain the PCM for GE.

(Ex. A at 91:3-93:14, Dep. Ex. 7; Ex. C at 145:23-146:10). GE's PCM was a collection of the processes and procedures utilized in connection with the maintenance of the Warren Lab. (Ex. A at 91:3-93:14). The PCM was and is also provided to new engineers so that they understand the lab environment. (Ex. C at 147:3-148:3).

85.     When Plaintiff drafted the PCM, he included information regarding the policies and procedures that he utilized to support the lab, including the policies and procedures for receiving equipment, inventorying equipment, installing equipment and connecting equipment to the network. (Ex. A at 91:5-21). Thereafter, he updated the manual so that CTI could use the manual as both an audit and instruction tool. (Ex. A at 91:5-92:16, Dep. Ex. 7).

**Plaintiff's Resignation**

86.     In May of 2006, Plaintiff expressed that he was dealing with issues of a personal nature. As a result of those issues, Plaintiff requested and took a leave of absence. (Ex. C at 140:9-21).

87.     In approximately June of 2006, Discepolo noticed that Plaintiff was not in the Warren Lab at times when the engineers needed his assistance. (Ex. C at 128:18-24). As a result, Discepolo began to monitor Plaintiff's time, and he learned that Plaintiff was working no more than 35 and 37 hours per week. (Ex. C at 89:16-23).

88.     Ultimately, in September of 2006, Discepolo issued Plaintiff a written warning for coming in late and leaving early that resulted in, among other things, his missing scheduled meetings. (Ex. C at 135:7-136-24). Plaintiff's attendance did not improve, and he received a final written warning for his attendance in February of 2007. (Ex. C at 142:12-144:2).

89.     After receiving two written warnings for coming in late and leaving early, in or about March 14, 2007, Plaintiff voluntarily resigned from his position as Lab Coordinator.

Plaintiff claimed that he resigned due to stress in connection with the performance of his Lab Coordinator duties. (Complaint ¶26; Ex. A at 27:2-30:16, Dep. Ex. 2).

Dated:  February 22, 2008                    Respectfully submitted,

                                                  By: _/s/_Sam_S._Shaulson_____
Sam S. Shaulson (SS 0460)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York  10178
(212) 309-6000

Sarah E. Bouchard (Pa. I.D. #77088)
Sarah E. Pontoski (Pa. I.D. #91569)
*Admitted Pro Hac Vice*
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5387/5077/5059/5763

19