LAW OFFICES
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6000

1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

ATTORNEYS FOR DEFENDANTS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARMELO MILLAN, individually, and on Behalf of All Other Persons Similarly Situated,<br><br>                Plaintiffs,<br><br>     vs.<br><br>CITIGROUP, INC.,<br>CITIGROUP TECHNOLOGY, INC.<br><br>              Defendants. | Civil Action No.  07-CIV-3769<br><br>*Electronically Filed* |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Sam S. Shaulson (SS 0460)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York  10178
(212) 309-6000

Sarah E. Bouchard (Pa. I.D. #77088)
Sarah E. Pontoski (Pa. I.D. #91569)
*Admitted Pro Hac Vice*
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5077/5059

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT .................................................................................................................... 2

I.     WHETHER PLAINTIFF WAS PROPERLY CLASSIFIED AS EXEMPT IS AN
       ISSUE OF LAW FOR THE COURT TO DECIDE. ........................................................ 2

II.    THE STATUTE OF LIMITATIONS BARS PLAINTIFF FROM ASSERTING
       AN FLSA CLAIM WITH RESPECT TO HIS ANALYST POSITION, AS WELL
       AS CERTAIN PERIODS OF TIME AS A LAB COORDINATOR. ............................... 3

III.   CITIGROUP INC. WAS NEVER PLAINTIFF'S EMPLOYER, AND THUS, IT
       CANNOT BE LIABLE UNDER EITHER THE FLSA OR NYLL. ................................ 4

IV.    PLAINTIFF WAS PROPERLY CLASSIFIED AS AN EXEMPT EMPLOYEE
       UNDER THE ADMINISTRATIVE EXEMPTION OF THE FLSA AND NYLL. ........... 5

       A.    Plaintiff Met The Salary Basis Test For The Administrative Exemption ............. 6

       B.    Plaintiff Performed Office Or Non-Manual Work ................................................ 7

             1.    Plaintiff's primary duty as a Lab Coordinator was the performance
                   of non-manual work ............................................................................... 8

             2.    Plaintiff's primary duty as an Analyst was the performance of non-
                   manual work ......................................................................................... 10

       C.    Plaintiff's Primary Duty Was Work Directly Related To General Business
       D.    Operations. ...................................................................................................... 11

             1.    Plaintiff's duties as a Lab Coordinator were directly related to the
                   general business operations of CTI. ..................................................... 12

             2.    Plaintiff's duties as an Analyst were directly related to the general
                   business operations of CTI. ................................................................. 14

       E.    Plaintiff's Duties Included The Use Of Discretion And Independent
             Judgment. ......................................................................................................... 15

             1.    Plaintiff exercised discretion and independent judgment in
                   connection with the performance of his Lab Coordinator job duties ....... 16

             2.    Plaintiff exercised independent discretion and judgment in
                   connection with his Analyst position. ................................................... 19

V.     PLAINTIFF WAS PROPERLY CLASSIFIED AS AN EXEMPT EMPLOYEE
       UNDER THE COMPUTER PROFESSIONAL EXEMPTION. ..................................... 20

       A.    Plaintiff Qualifies As A Professional ................................................................ 20

       B.    Plaintiff's Primary Duties Qualified Him As Exempt Under The Computer
             Professional Exemption. ................................................................................... 22

# TABLE OF CONTENTS
(continued)

**Page**

|  | 1. | Plaintiff's primary duties as a Lab Coordinator qualified him as exempt under the computer exemption. | 25 |

1. Plaintiff's primary duties as a Lab Coordinator qualified him as exempt under the computer exemption. ...................................................... 25

2. Plaintiff's primary duties as an Analyst qualified him as exempt under the computer exemption ................................................................. 27

VI.     PLAINTIFF WAS EXEMPT UNDER THE COMBINATION EXEMPTION ............. 28

CONCLUSION ......................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

### CASES

Bagwell v. Fla. Broadband, LLC,
385 F. Supp. 2d 1316 (S.D. Fla. July 22, 2005)........................................................7, 12, 15, 21, 23

Bergquist v. Fid. Info. Serv., Inc.,
399 F. Supp. 2d 1320 (M.D.Fla. 2005)..................................................................................23, 24

Bobadilla v. MDRC,
Civ. A. No. 03-9217, 2005 WL 2044938 (S.D.N.Y. Aug. 24, 2005)................................13, 21, 23

Boyke v. Superior Credit Corp.,
No. 01-CV-0290, 2006 WL 3833544 (N.D.N.Y Dec. 28, 2006).......................................................4

Carter v. Dutchess Cmty. Coll.,
735 F.2d 8, 12 (2d. Cir. 1984)........................................................................................................5

Castro v. Metro. Trans. Auth.,
No. 04-CIV-1445, 2006 WL 1418585 (S.D.N.Y. May 23, 2006)..............................................7, 12

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)........................................................................................................................2

Davis v. Lenox Hill Hosp.,
03 Civ. 3746, 2004 WL 1926086 (S.D.N.Y August 31, 2004) .......................................................3

Doo Nam Yang v. ACBL Corp.,
427 F. Supp. 2d 327 (S.D.N.Y. 2005).............................................................................................4

Edwards v. Audubon Ins. Group, Inc.,
No. 3:02-1618 (WS), 2004 WL 3119911 (S.D. Miss. Aug. 31, 2004)............................................5

Galasso v. Eisman, Zucker, Klein & Ruttenberg,
310 F. Supp. 2d 569 (S.D.N.Y. 2004).............................................................................................3

Goldberg v. Whitaker House Co-op., Inc.,
366 U.S. 28 (1961)..........................................................................................................................4

Herman v. RSR Sec. Serv., Ltd.,
172 F.3d 132 (2d Cir. 1999)............................................................................................................4

Icicle Seafoods, Inc. v. Worthington,
475 U.S. 709 (1986)........................................................................................................................2

Koppinger v. Am. Interiors, Inc.,
295 F. Supp. 2d 797 (N.D. Ohio 2003)..............................................................7, 12, 15

Lutz v. Ameritech Corp.,
208 F.3d 214, 2000 WL 245485 (6th Cir. Feb. 23, 2000) .............................7, 12, 13, 15

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)..................................................................................................2

McElroy v. Klein,
Civ. A. No. 05-5437, 2007 WL 1821699 (S.D.N.Y. June 26, 2007) .............................4

McKoy v. Henderson,
No. 05 Civ. 1535 DAB, 2007 WL 678727 (S.D.N.Y March 5, 2007) ...........................4

McLaughlin v. Nationwide Mut. Ins. Co.,
No. 02-6205 (TC), 2004 WL 1857112 (D. Or. Aug. 18, 2004)....................................5

Robinson-Smith v. Gov't Employees Ins. Co.,
323 F. Supp. 2d 12 (D.D.C. 2004) ..............................................................................5

Topo v. Dhir,
No. 01-CV-10881, 2004 WL 527051 (S.D.N.Y. Mar. 16, 2004) ..................................3

## STATUTES

29 U.S.C. §203(d) ......................................................................................................4

29 U.S.C. § 207(a) ......................................................................................................2

29 U.S.C. § 255............................................................................................................3

## REGULATIONS

29 U.S.C. §203(d) ......................................................................................................4

29 U.S.C. § 207(a) ......................................................................................................2

29 U.S.C. § 255............................................................................................................3

29 C.F.R. §541.118(a) .................................................................................................6

29 C.F.R. § 541.200(a)................................................................................5, 6, 7, 11, 15

29 C.F.R. § 541.201(b) ..............................................................................................11

iv

29 C.F.R. § 541.202(a)................................................................................................15

29 C.F.R. § 541.205................................................................................................11, 12

29 C.F.R. § 541.207(a)................................................................................................15

29 C.F.R. § 541.2(e)................................................................................................6, 7

29 C.F.R. § 541.300(a)................................................................................................21

29 C.F.R. § 541.300(e)................................................................................................21

29 C.F.R. § 541.301................................................................................................21

29 C.F.R. § 541.400(a)................................................................................................22

29 C.F.R. § 541.600 (old)................................................................................................28

29 C.F.R. § 541.708 (new)................................................................................................28

## RULES

12 N.Y.C.R.R. 142-2.2................................................................................................3

N.Y. Lab. Law § 198(3)................................................................................................3

## MISCELLANEOUS

FLSA 2005-25, DOL Opinion Letter
(August 26, 2005) ................................................................................................6

## PRELIMINARY STATEMENT

Plaintiff Carmello Millan ("Millan" or "Plaintiff"), a former Lab Coordinator and Analyst for Citigroup Technology, Inc. ("CTI"), has brought claims against CTI, his former employer, and Citigroup Inc., an entity that never employed him.  Specifically, he has claimed that he was improperly classified as exempt from overtime pay under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").  Plaintiff's FLSA claim, however, is barred by the FLSA's statute of limitations to the extent that he seeks damages for overtime that he allegedly worked while he was employed as an Analyst for CTI from June 5, 2000 until December of 2003 and as a Lab Coordinator from December of 2003 until November 5, 2004.  Furthermore, both Plaintiff's FLSA and NYLL claims against Citigroup Inc. are futile because Citigroup Inc. was never Plaintiff's employer, and thus, it cannot be held liable under the FLSA or NYLL.

Moreover, Plaintiff's own admissions -- made during his sworn deposition, on his resume and in internal company documents that he authored -- establish as a matter of law that he was properly classified as exempt from overtime pay under both the administrative and computer professional exemptions.  These admissions also make clear that Plaintiff is a disgruntled former employee of CTI who in fact became overwhelmed with the *abundance of responsibility* that he received and, as a result, worked significantly less than 40 hours per week during the last year of his employment.

As demonstrated below, courts, including courts within the Second Circuit itself, universally and consistently have held that employees like Plaintiff who engage in sophisticated network and connectivity planning and problem solving and prepare inventory and compliance

documentation spend a majority of their time performing exempt duties.  For these reasons, Plaintiff's claims should be dismissed in their entirety.

## **ARGUMENT**

### I.    **WHETHER PLAINTIFF WAS PROPERLY CLASSIFIED AS EXEMPT IS AN ISSUE OF LAW FOR THE COURT TO DECIDE.**

Summary judgment should be granted where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  If the evidence in the record "could not lead a trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and the motion should be granted.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The FLSA requires overtime compensation to be paid to any non-exempt employee who works in excess of forty hours in a regular workweek.  See 29 U.S.C. § 207(a).  In wage and hour cases brought under the FLSA, the ultimate decision of whether the duties and activities of an employee qualify as exempt work is a question of law for the court to resolve.  Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986) (whether particular activities excluded plaintiffs from "overtime benefits of the FLSA is a question of law.").

Viewing all facts in the light most favorable to Plaintiff, there are no genuine issues of material fact on the issue of Plaintiff's eligibility for overtime compensation.  Because Plaintiff's primary duty -- by his own repeated admissions -- consisted of tasks that are exempt activities, CTI properly classified Plaintiff as exempt from overtime compensation under the FLSA's administrative and computer professional exemptions.

## II. THE STATUTE OF LIMITATIONS BARS PLAINTIFF FROM ASSERTING AN FLSA CLAIM WITH RESPECT TO HIS ANALYST POSITION, AS WELL AS CERTAIN PERIODS OF TIME AS A LAB COORDINATOR.

In an FLSA collective action, the statute of limitations runs for each plaintiff from the date that the plaintiff files a written consent opting into the suit. 29 U.S.C. §§255, 256. Signed consents do not relate back to the original filing date of the complaint. See Davis v. Lenox Hill Hosp., 03 Civ. 3746, 2004 WL 1926086, at *8 (S.D.N.Y August 31, 2004). The FLSA provides a two-year statute of limitations for an action to recoup overtime payments, and a three-year period for willful violations. 29 U.S.C. ¶255(a).

Plaintiff did not file his Consent until November 6, 2007. (See Docket No. 21). Therefore, any FLSA claim that accrued before November 6, 2004, more than three years prior to the date that he filed his Consent, are time-barred by the statute of limitations regardless of whether Plaintiff could establish a willful violation of the FLSA. Plaintiff became a Lab Coordinator in December of 2003, and thus, any FLSA claim related to his position as an Analyst, as well as time spent between December 2003 and November 5, 2004 as Lab Coordinator, are barred by the statute of limitations. (SM[1] ¶50). [2]

---

[1]    SM refers to the Local Rule 56.1 Statement Of Undisputed Material Facts In Support Of Defendants' Motion For Summary Judgment.

[2]    Defendants acknowledge that to the extent that Plaintiff claims that his NYLL claim regarding his Analyst position accrued after May 10, 2001, six years prior to when he filed his complaint, it is not barred by the statute of limitations. See N.Y. Lab. Law § 198(3). Plaintiff's NYLL claim is governed by the same standards as Plaintiff's FLSA claim because the New York regulation that purports to require the payment of overtime, 12 N.Y.C.R.R. 142-2.2, explicitly incorporates the FLSA's exemptions. 12 N.Y.C.R.R. 142-2.2; see also Topo v. Dhir, No. 01-CV-10881, 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004) (noting that there is "general support for giving FLSA and the New York Labor Law consistent interpretations"); Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F.Supp.2d 569, 575 (S.D.N.Y. 2004) (recognizing NYLL also exempts learned professionals from coverage [and] [t]he tests under the two statutes and their corresponding regulations are identical). Thus, the standard for determining whether Plaintiff is exempt under NYLL is identical to the FLSA's exemption standards.

III.    **CITIGROUP INC. WAS NEVER PLAINTIFF'S EMPLOYER, AND THUS, IT CANNOT BE LIABLE UNDER EITHER THE FLSA OR NYLL.**

To be liable under both the FLSA and NYLL for overtime payments, an entity must be an "employer" that employs an "employee." 29 U.S.C. §203(d); Doo Nam Yang v. ACBL Corp., 427 F.Supp.2d 327, 342 (S.D.N.Y. 2005). Under the FLSA, an employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. §203(d); see also McKoy v. Henderson, No. 05 Civ. 1535 DAB, 2007 WL 678727, at *8 (S.D.N.Y March 5, 2007). Under NYLL, an employer includes any "person employing any [employee]. N.Y. Labor Law ¶2(6); see also N.Y. Labor Law ¶651(6). Courts within this Circuit have recognized that the definition of employer under both the FLSA and NYLL are generally interpreted consistent with one another. See, e.g. McElroy v. Klein, Civ. A. No. 05-5437, 2007 WL 1821699, at *6, n. 6 (S.D.N.Y. June 26, 2007) (recognizing that in Second Circuit "FLSA and New York Labor Law are generally interpreted consistently with each other with respect to the definitions of 'employer' and 'employee'"); Doo Nam Yang, 427 F.Supp.2d at 342 (applying same test to determine whether individual was employer under NYLL and FLSA); Boyke v. Superior Credit Corp., No. 01-CV-0290, 2006 WL 3833544, at *7 (N.D.N.Y Dec. 28, 2006) (recognizing the "economic reality" test is used to determine whether an entity is an "employer" as defined under both state and federal law).

The central inquiry into whether an entity is an employer under the FLSA and NYLL is "whether the alleged employer possessed the power to control the workers in question…with an eye to the 'economic reality' presented by the facts of each case." Herman v. RSR Sec. Serv., Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (quoting Goldberg v. Whitaker House Co-op., Inc., 366

U.S. 28, 33 (1961).  Factors to consider when examining the "economic reality of a particular situation include "'whether the alleged employer (1) had the power to hire and fire the employee, (2) supervised and controlled employee's work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records,'" though no single factor is dispositive.  Id. (quoting Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d. Cir. 1984).

Under the "economic reality" test, Citigroup Inc. was not Plaintiff's employer.  Plaintiff cannot establish that Citigroup Inc. had the power to hire or fire him.  (SM ¶3).  Nor can Plaintiff establish that Citigroup Inc. controlled Plaintiff's work schedules or conditions of employment.  (Id. ¶3).  Moreover, Plaintiff cannot determine that Citigroup Inc. either determined Plaintiff's rate or method of payment.  (Id. ¶3).  Rather, CTI had the power to hire and fire Plaintiff as well as control his work schedule and conditions of employment.  (Id. ¶4).  Likewise, CTI paid Plaintiff's salary.  (Id. ¶5).  Consequently, Citigroup Inc. cannot be liable under the FLSA or NYLL because it was never Plaintiff's employer.

## IV.   PLAINTIFF WAS PROPERLY CLASSIFIED AS AN EXEMPT EMPLOYEE UNDER THE ADMINISTRATIVE EXEMPTION OF THE FLSA AND NYLL.

Plaintiff clearly meets the requirements for an exemption under the FLSA and NYLL's administrative exemption.  The requirements for this exemption under the old regulations' "short test" [3] and the 2004 regulations[4] are essentially the same.  The employee's primary duties must

---

[3]    Prior to August 2004, the DOL promulgated two different tests for the administrative exemption:  a "long test," which applied to employees earning a salary more than $155 per week but less than $250 per week; and a "short test," which applied to employees earning more than $250 per week.  See 29 C.F.R. §§541.2(e)(2).

[4]    In August of 2004, the DOL issued new regulations regarding the administrative exemption.  Those Regulations made no substantial change to the existing test for the administrative exemption, but did attempt to clarify application of the exemption for the specific purpose of avoiding litigation.  See 69 Fed. Reg. 22145 (Apr. 23, 2004); see also

be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and the primary duty must include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2)-(3) (new); 29 C.F.R. 541.2(e) (old).  In addition, under the old regulations, the employee must be compensated "on a salary or fee basis at a rate of not less than $250.00 per week."  29 C.F.R. §541.2 (old).  Under the new regulation, the employee must be compensated "on a salary or fee basis at a rate of not less than $455.00 per week."  29 C.F.R. § 541.200(a) (new).

### A.     Plaintiff Met The Salary Basis Test For The Administrative Exemption.

To meet the salary basis test, an employee has to "regularly receive[] . . . a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of work performed."  29 C.F.R. §541.118(a).  Pursuant to DOL regulations, under the old regulations, the "short test" applied to those employees receiving $250.00 or more per week.  29 C.F.R. §541.2(e)(2) (old).  Similarly, under the new regulations, the test applies to employees receiving $455.00 or more per week.  29 C.F.R. § 541.200(a) (new).  It is undisputed that while Plaintiff was both an Analyst and a Lab Coordinator, he received more than $455.00 per week, and thus, he satisfies the salary basis test requirements for the administrative exemption under both the old and the new regulations.  (SM ¶¶5-6).

-----

McLaughlin v. Nationwide Mut. Ins. Co., No. 02-6205 (TC), 2004 WL 1857112, at * 4 n. 2 (D. Or. Aug. 18, 2004) (finding Regulations interpreting administrative exemption, 29 C.F.R. § 541.200 et seq., as "essentially the same" as the regulations prior to 2004); Edwards v. Audubon Ins. Group, Inc., No. 3:02-1618 (WS), 2004 WL 3119911, at *4 (S.D. Miss. Aug. 31, 2004) (same); Robinson-Smith v. Gov't Employees Ins. Co., 323 F. Supp. 2d 12, 18 (D.D.C. 2004); see also DOL opinion letter, FLSA 2005-25, dated August 26, 2005 ("There were no substantive changes in the primary duty test requirements for the administrative exemption.").

## B.     Plaintiff Performed Office Or Non-Manual Work

Under the administrative exemption, Plaintiff's primary duties must consist of the performance of office or non-manual work.  29 C.F.R. § 541.200(a)(2)-(3) (new); 29 C.F.R. 541.2(e) (old); Castro v. Metro. Trans. Auth., No. 04-CIV-1445, 2006 WL 1418585, at *3, n 6 (S.D.N.Y. May 23, 2006) (granting summary judgment in favor of employer and recognizing that regular review and oversight of inventory was non-manual work); Lutz v. Ameritech Corp., 208 F.3d 214, 2000 WL 245485, at *3 (6th Cir. Feb. 23, 2000) (granting motion for summary judgment in favor of employer and finding employee's work was non-manual when his primary duties centered around designing and overseeing plan to provide employer access to intra-office computer network); Koppinger v. Am. Interiors, Inc., 295 F.Supp.2d 797, 802 (N.D. Ohio 2003) (finding maintenance, upgrading and administering computer systems primarily non-manual in nature despite plaintiff's installation of computer equipment when plaintiff's deposition testimony established prominence of problem-solving, planning and purchasing duties); Bagwell v. Florida Broadband, LLC, 385 F.Supp.2d 1316, 1323 (S.D. Fla. July 22, 2005) (finding plaintiff performed non-manual work when he wrote specifications, specified protocols, designed and assured proper installation of all cabling infrastructure, consulted with clients regarding LAN design and technical specifications, interacted with vendors, maintained network documentation, approved site installations of infrastructure and equipment, designed and implemented LAN infrastructure, assigned work to field technicians, and handled customer problems).  For the reasons set forth below, Plaintiff's primary duties as both a Lab Coordinator and Analyst was the performance of non-manual work.

**1.     Plaintiff's primary duty as a Lab Coordinator was the performance of non-manual work.**

As overwhelmingly indicated by Plaintiff's resume, Plaintiff's primary duties in his role of Lab Coordinator predominantly consisted of non-manual work, including, problem solving, planning and purchasing duties:

- Participated in build out and daily operations of 6000 sq. ft. 1000+ device Lab/Development Data Center which serviced over 400 Research and Development Engineers;

- Participated and Implemented Lab/Data Center;

- Consolidated/Migrated five major Citi[5] Global Engineering labs to the Warren Facility;

- Evaluated all incoming testing efforts and built the proper environment or engaged the proper engineering discipline to assist in test effort;

- Configured, maintained, documented, and supported development network;

- Upgraded Cisco IOS on routers and switches;

- Managed network connectivity, implementation, integration and troubleshooting for servers, routers, and storage devices;

- Ordered and installed networking gear, servers, and lab supplies;

- Determined the placement and power provisioning of servers, network and storage devices for installation in Lab/Development Data Center;

- Worked with vendors and engineers to determine equipment environmental requirements prior to on site delivery;

- Setup and configured console and KVM connections on all gear;

- Installed and configured all network connections for servers, SAN, and networking gear;

- Aggressively monitored, managed and resolved customer request and trouble tickets;

---

[5]     As used in this memorandum of law, "Citi" refers to Citigroup Inc., its subsidiaries and their affiliates.

- Reviewed and scheduled all testing requests;

- Monitored power consumption, environmental issues and change control activities;

- Provided input for Development Data Center policies and communicated them to our engineers, teams, internal staff, business units and vendors.

(SM ¶¶50, 60, 63, 65, 66, 70-72, 77, 79, 81-83). Plaintiff testified in this litigation that his resume accurately reflects his duties at CTI. (Id. ¶17, n 3).

In addition to the duties specified on Plaintiff's resume, he also testified that he was responsible for inventorying millions of dollars worth of equipment in the Warren Lab and documenting all of the devices that came into the lab that needed to be installed. (SM ¶¶81-82). Finally, as part of his Lab Coordinator duties, Plaintiff also drafted and finalized the Process Control Manual ("PCM") for Warren. (Id. ¶¶83-85). The PCM for Warren is a comprehensive directive on the policies and procedures involved in maintaining the Warren Lab. (Id.). In drafting the PCM, Plaintiff documented the procedures that he utilized to support the lab, including the procedures that he utilized to receive inventory, and establish network connectivity. (Id.). After he drafted the initial PCM, Plaintiff made any necessary updates to the Manual. (Id. ¶85).

Moreover, Plaintiff was responsible for the design of the Warren Lab and for creating databases utilized by the Warren Lab to document connectivity and inventory. (Id. ¶60-62, 81). In addition, Plaintiff evaluated all incoming testing efforts and maintained good working relationships with eight different engineering disciplines. (Id. ¶¶72-74).

The breadth of Plaintiff's responsibilities convincingly indicates that his duties were comprehensive in nature and covered a wide spectrum of roles within Warren. Plaintiff not only designed the layout of an entire lab facility and created databases for use in the lab, but he also assisted with the ordering and installation of servers and lab supplies, assisted in the

development of lab policies, provided input on policies to engineers, internal staff, business units and vendors, and was responsible for inventorying all of the equipment in the entire lab facility—all non-manual work.  (See supra at 8-9).

### 2. Plaintiff's primary duty as an Analyst was the performance of non-manual work.

Plaintiff acknowledged that one of the most important functions of his job as an Analyst was to create and maintain documentation of network connectivity so if there were a problem with an end user's connectivity, he or another Analyst could effectively and efficiently troubleshoot the problem.  (SM ¶¶22-25).  CTI provided him with a computer and e-mail to prepare this documentation.  (See id. ¶28).

In addition, Plaintiff engaged in problem solving and planning in connection with his administration and upgrading of network connectivity.  (SM ¶¶16-21, 26-35, 37-44).  Plaintiff was also responsible for organizing and articulating compliance procedures and ensuring that his group addressed all TRAM (back-office related issues).  (Id. ¶¶45-49).

In addition, according to Plaintiff's resume, he displayed a prominence of problem solving, planning, and documentation while performing the following duties:

- handled the network connectivity and software checkout aspects of Moves, Adds and Changes to the company network;

- conducted proactive internal/external escalation, trouble ticketing, and reporting for 38 floors in a mixed DHCP/static, 10/100 switched Ethernet, gigabit backbone environment;

- participated in installation and activation of all equipment in Data Center and Comm. Closets;

- created and implemented Salt & Peppering schemes to provide desktop, server and network redundancy;

- worked with Network Operations, Engineering, Integration, as well as company business units in diagnosing, troubleshooting & resolving company wide network problems;

- tested different media types with different testing devices including but not limited to butt sets, fiber testers, Mod-Taps and Fluke meters;

- responsible for creation, maintenance, and accuracy of all network connectivity related databases/worksheets.

(SM ¶¶17-21, 24, 36-37, 44).  Thus, it is clear that the majority of Plaintiff's duties as an Analyst were primarily non-manual in nature.

## C.    Plaintiff's Primary Duty Was Work Directly Related To General Business D. Operations.

To qualify for the administrative exemption, Plaintiff's work must also be directly related to an employer's management or general business operations.  29 C.F.R. § 541.201(a) (new); 29 C.F.R. § 541.205(a) (old).  Both the old and new regulations stress that the phrase "directly related to the management or general business operations" means that the primary duties must be "directly related to assisting with the running or servicing of the business."  29 C.F.R. § 541.201(a) (new); 29 C.F.R. § 541.205(a) (old).  The requirement that an employee's primary duties be directly related to an employer's management or general business operations is *not*, however, limited to persons who participate in the formulation of management policies or in the operation of the business as a whole.  Under the old regulations, the test is also met by individuals whose "work affects policy or whose responsibility it is to execute or carry [] out" policy.  29 C.F.R. § 541.205(c).  The new regulations provide that "work directly related to management or general business operations" includes, but is not limited to things such as budgeting, quality control, advertising, marketing, safety and health, personnel management and legal and regulatory compliance.  See 29 C.F.R. § 541.201(b).

11

Accordingly, exempt administrative employees "include[] a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business."  29 C.F.R. § 541.205(c); see also Lutz, 2000 WL 245485, at * 2 (affirming summary judgment for defendant, and finding plaintiff's duty of "providing access to the intra-office computer network to various groups within [the company]" and that plaintiff was "vital player in implementing new programs and solving network problems" established that he was engaged in work directly related to general business operations); Koppinger, 295 F.Supp. 2d at 802 (recognizing that employee's work directly related to management of general business operations, where employee had control of computer system from "end to end" and his work was comprehensive in nature); Castro, 2006 WL 1418585, at *3 (recognizing that development and implementation of new policies, as well as regular review and oversight of inventory is work that is directly related to management or general business operations of employer); Bagwell, 385 F.Supp.2d at 1324-25 (finding plaintiff engaged in activities directly related to administrative operations of business because employer's business was providing Internet service, its success was dependant upon whether it could provide Internet service, and plaintiff's job involved advising management, planning and finding network solutions to complex problems to ensure network system functioned reliably so that employer could provide Internet service).

## 1.    Plaintiff's duties as a Lab Coordinator were directly related to the general business operations of CTI.

There is no doubt that Plaintiff's responsibilities as a Lab Coordinator were directly related to the general business operations of CTI.  Specifically, the operation of the Warren Lab was essential to CTI's business, as CTI engages in the business of providing connectivity

services to Citi for use in connection with its banking and other businesses. (SM ¶¶7-10). The Warren Lab is and was a testing facility that CTI utilizes to ensure proper connectivity, and it is essential to CTI's business to have a proper testing facility so that it can provide reliable connectivity services to Citi businesses. (Id.).

Plaintiff admitted that CTI could not move a major lab facility to Warren without him. (SM ¶¶58-59). As Plaintiff aptly stated, without him, "[t]he lab wasn't going to move." (Id. ¶59). The move was a large-scale undertaking that required moving hundreds of devices that were worth millions of dollars. (Id. ¶¶55, 82). Furthermore, Plaintiff had complete responsibility of the move from "end to end," and he was able to "[d]raw on his experience…to perform multiple roles in the Lab Migration Project…project manager, infrastructure technician, datacenter management, and network integration." (Id. ¶57).[6] Moreover, in connection with his design of the new lab, it was Plaintiff's job to ensure that all GE disciplines remained fully viable after the lab moved to Warren. (Id. ¶67).

In connection with his day-to-day duties, Plaintiff provided critical services to the engineering community - he insured that everything in the lab worked properly, and if it did not work, he used his discretion to aggressively trouble shoot the problem. (SM ¶ 71). Plaintiff was also responsible for evaluating all incoming testing efforts and building the proper environment or engaging the proper engineering discipline to assist in the test efforts in the Warren Lab. (Id.

---

[6]     To the extent Plaintiff should attempt to cite to his own recent testimony that downplays his responsibility and contradicts his resume and other documents created before this lawsuit, the Court should not permit such testimony to defeat summary judgment. See Bobadilla v. MDRC, Civ. A. No. 03-9217, 2005 WL 2044938, at *7-8 (S.D.N.Y. Aug. 24, 2005) (granting summary judgment in favor of employer and finding plaintiff's resume and evaluation forms are probative of plaintiff's duties); see also Lutz, 2000 WL 245485, at *3 (granting summary judgment in favor of employer; finding that when plaintiff's own written characterization of his job conform with his manager's description of his job functions, then he cannot attempt to explain away the exempt nature of his job functions).

¶72). As a Lab Coordinator at the Warren Lab, Plaintiff not only assisted roughly four hundred (400) engineers with testing and implementation, but he was also a central point person in the lab. His duties included facilitating requests and communicating with engineers who the proper person was to solve their problems. (Id. ¶73). Finally, Plaintiff worked with multiple vendors and engineers to coordinate product development and ensure proper environmental testing environment prior to the delivery of new equipment. (Id. ¶¶76, 79).

Thus, it is clear that because Plaintiff was ultimately responsible for the migration of the lab and ensuring that CTI had a properly functioning lab facility to provide a reliable testing ground for CTI's connectivity services, his work was directly related to the general business operations of CTI.

> **2.     Plaintiff's duties as an Analyst were directly related to the general business operations of CTI.**

CTI provides connectivity services to Citi, and its various end users. (SM ¶11). As an Analyst, Plaintiff was responsible for ensuring adequate connectivity provided by CTI to the Citi businesses, some of which were traders and needed constant connectivity to the various CTI networks. (Id. ¶¶22-23). The consequence of not establishing proper network connectivity could be catastrophic. (Id.). For example, if only one Citi trader lost connectivity and was unable to trade for two hours, the losses could have been substantial – perhaps in the millions of dollars. (Id. ¶23). If more than one trader or an entire trading desk lost connectivity, the financial consequences could impact the profitability of Citi businesses on a much greater basis. (Id. ¶23). Thus, because CTI was in the business of providing connectivity services to Citi businesses, and Plaintiff was ultimately responsible for ensuring that CTI provided adequate connectivity services, it is clear that his work affected business operations to a substantial degree. Therefore, Plaintiff's work was directly related to the general business operations of CTI.

**E.      Plaintiff's Duties Included The Use Of Discretion And Independent Judgment.**

Both the old and new regulations define "discretion and independent judgment" as involving "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.207(a) (old); 29 C.F.R. § 541.202(a) (new).  Courts have concluded that the following tasks – all of which Plaintiff performed – involve the requisite amount of discretion and independent judgment necessary to satisfy the administrative exemption:  1) managing a computer system for an employer; 2) deciding what tasks to perform and when to perform them, with almost no supervision; 3) personally assessing the needs of clients and implementing projects to meet those needs; 4) using independent judgment to solve computer problems; and 5) making suggestions for new hardware and software.  Lutz, 2000 WL 245485, at *3 (finding employee exercised sufficient discretion and independent judgment when he "assesse[d] the needs of clients, develope[d] installation plans for access to the intra-company network, and coordinate[d] with various departments to arrange installation and ensures that plans [were] implemented.");  Koppinger, 295 F.Supp.2d at 805 (finding employee exercised sufficient discretion and independent judgment when he not only fixed computers, but also decided what priority to place tasks and what course of action to take with respect to repair requests and when he made suggestions for new hardware, software, or server installations); Bagwell, 385 F.Supp.2d at 1326 (finding that because plaintiff "determined the exact nature of various network problems and, alone or in collaboration with [his supervisor], structured various problems in a logical manner so that a system to solve the problems and obtain the desired results could be developed" he exercised independent judgment).

Bagwell is particularly analogous to the instant case.  In Bagwell, the plaintiff had discretion to purchase equipment to improve and correct the network, and he spent most of his day problem solving and thinking about ways to improve the network.  385 F.Supp.2d at 1326. He also ensured proper installation of all cabling infrastructure, and consulted with clients regarding LAN design, technical specifications and approving installations.  Id.  Because he determined the exact nature of network problems, and structured a logical solution to solve those problems and obtain desired results, the Court determined that he exercised independent judgment.  Id.

Like the plaintiff in Bagwell, in both his Lab Coordinator and Analyst positions, Plaintiff spent the majority of his day problem solving, using his discretion and judgment to: 1) install servers; 2) ensure the proper installation of cabling; 3) consult with product managers and engineers regarding technical specifications; 4) purchase of proper cabling products to ensure proper connectivity; and 5) and create and implement compliance policies.  Thus, for the reasons set forth below, Plaintiff exercised discretion and independent judgment as both a Lab Coordinator and Analyst.

### 1. Plaintiff exercised discretion and independent judgment in connection with the performance of his Lab Coordinator job duties.

When Plaintiff worked as a Lab Coordinator, he was loosely supervised and did not have daily oversight.  (SM ¶¶52).  Specifically, he did not sit on the same floor as his supervisor, and he communicated with him via e-mail and telephone only when absolutely necessary.  (Id.). Given his incredible track record on projects as a Analyst, Plaintiff was given the responsibility for moving the entire Greenwich Street Lab to a new location in Warren, NJ.  (Id. ¶¶50, 54-61). As part of those duties, Plaintiff completed the initial design and layout of the Warren Lab, and his supervisors merely reviewed and provided final approval.  (Id. ¶¶60-63).

As part of the Warren lab migration, Plaintiff also assessed the needs of the Warren Lab and implemented projects to meet those needs.  Plaintiff's supervisors relied on him to use his independent discretion and judgment to "gauge what needs to happen" to ensure that the move was successful.  (SM ¶58).  Plaintiff acknowledged that in connection with his duties and responsibilities as a Lab Coordinator, he needed to "act like a professional" to ensure that the move was completed on schedule and without interruptions in the service it provided to CTI. (Id.).

The Warren move required Plaintiff to manage many different moving parts.  Drawing on his experience, Plaintiff performed multiple roles in the lab migration -- project manager, infrastructure technician, datacenter management and network integration.  (SM ¶¶57).  As part of the migration, Plaintiff built a firewall.  (Id. ¶64).  For example, Plaintiff communicated detailed instructions to other CTI employees regarding tasks that needed completion before Citi's *five* major Global Engineering Labs could migrate to the Warren Lab.  (Id. ¶55, 62-63).  When designing the Warren Lab, Plaintiff determined how to move the equipment, how to complete the inventory, how to configure the new lab, and how to appropriate a firewall.  (Id. ¶¶57-69).

Once the lab had migrated to Warren, which took more than 18 months, Plaintiff demonstrated independent discretion and judgment in his day-to-day interaction with approximately 400 engineers in the Warren Lab.  (SM ¶¶54, 73).[7]  In fact, Plaintiff not only collaborated with engineers with testing and implementation, but he also decided what course of action to take by directing the engineers to the proper subject matter experts to help them with their testing requests.  (Id. ¶¶73-74).

---

[7]    These were also Plaintiffs duties at the Greenwich Street Lab prior to the migration to Warren, N.J.  (SM ¶54).

Additionally, Plaintiff evaluated all incoming testing efforts, built the proper environment, engaged the proper engineering discipline to assist in test efforts, determined the placement and power provisioning of servers, network, and storage devices for installation in Lab/Development Data Center and configured all network connections to the servers. (SM ¶¶71-72). He also exercised his own initiative and judgment by "evaluating different vendor products that [would] improve the efficiency of the CTI GE Lab," (id. ¶76), and "[w]ork[ing] with vendors and engineers to determine equipment environmental requirements prior to on site delivery." (Id. ¶79). Finally, Plaintiff "maintain[ed] good working relationships with representatives from eight different engineering disciplines whose requirements and priorities often contradict[ed] each other." (Id. ¶74). Through these relationships, Plaintiff provided his insights and decision making authority not only to those within CTI but those outside CTI. (Id.).

Separate from the duties described above, Plaintiff was responsible for tracking the Warren Lab's millions of dollars in inventory for insurance purposes. (SM ¶¶81-82).[8] Plaintiff further exercised discretion and independent judgment by providing his input for the development of lab policies to those within CTI and those outside CTI. (SM ¶83). Plaintiff contributed his insights and opinions to finalize the overall PCM for the Global Engineering Lab. (Id. ¶¶83-85). Based on his past experience as an Analyst, Plaintiff was familiar with how to create and maintain these detailed procedures and controls, and as a result, Plaintiff created and maintained the PCM for the Warren Lab. (Id. ¶84). Specifically, he "supported the lab on paper" by outlining the policies and procedures for receiving inventory and installing equipment; placing equipment on the network, and ensuring that the lab adhered to compliance protocol.

---

[8]    Plaintiff was also responsible for managing and documenting inventory for this purpose while the lab was located at Greenwich Street. (SM ¶¶81-82).

(Id. ¶83-85).  After Plaintiff completed the first version of the PCM, he was responsible for

making any necessary changes to it on an ongoing basis.  (Id. ¶85).[9]

## 2. Plaintiff exercised independent discretion and judgment in connection with his Analyst position.

Plaintiff's breadth and depth of duties as an Analyst also required him to routinely

exercise independent discretion and judgment.  While an Analyst, Plaintiff's supervisors gave

him assignments, and Plaintiff utilized his knowledge of cabling and networking to self-manage

various assignments and perform them with little to no input from his supervisors.  (SM ¶16).  In

completing his assignments, Plaintiff used his discretion to aggressively monitor, manage and

resolve end users' connectivity problems.  (Id. ¶19).  Specifically, when an end user indicated

that he or she could not connect to the network, Plaintiff utilized various troubleshooting

techniques that he honed through experience, as well as through his independent courses of self-

study.  (Id. ¶¶13-15, 19-21).  Plaintiff also used his discretion and independent judgment testing

port connectivity and ensuring that ports that were not in use were disconnected from the

network.  (Id. ¶¶26-27).  Again, port connectivity (or lack thereof) has serious consequences for

a business like CTI, and because of the myriad of ports, networks, and cabling schemes, testing

needed to be left to the subject matter experts – like Plaintiff.  (Id. ¶¶22-23, 26-27).

In connection with buildouts and user moves, adds and changes, Plaintiff conducted

testing and participated in meetings with engineering and network subject matter experts to make

---

[9]     To the extent that Plaintiff should claim that he did not exercise discretion and independent judgment because he did not have the "ultimate authority" to make decisions regarding the lab, his claim fails.  Although an employee may not have the ultimate authority to make decisions regarding an employer's operations, that does not defeat a finding that he exercised independent discretion and judgment.  Bagwell v. Broadband, LLC, 385 F.Supp.2d 1316, 1325-6 (S.D.Fla. 2005) (internal cites omitted) (finding that even though plaintiff did not have ultimate authority to make decisions he exercised independent judgment and discretion because he made suggestions to supervisors and wrote specifications).

suggestions regarding the proper purchase of cabling and whether there was sufficient port capacity. (SM ¶¶28-34). He also was the lead Analyst responsible for several large build-outs, (id. ¶¶35), given his knowledge of networking. (Id. ¶¶13-15).

Similarly, Plaintiff's work in the data center required him to use independent discretion and judgment. Plaintiff consulted with engineers to ensure that they used the correct cable specifications, to ensure that the engineer's initial plan for the data center met environmental requirements and to ensure connectivity. (SM ¶¶36-44). This procedure enabled CTI to ensure quality assurance of the design. (Id. ¶39).

Plaintiff also exercised independent discretion and judgment by showing initiative to address TRAM (back-office computer system) related and compliance related issues at the Greenwich Lab, including successfully organizing and articulating procedures for CTI's annual Continuity of Business test, also known as the disaster recovery plan. (SM ¶¶45-49). Tom Saranello, his direct supervisor at the time, gave him free reign to work on this project, and Plaintiff interfaced directly with the compliance department on this plan. (Id. ¶45). Finally, Plaintiff exercised independent discretion and judgment by maintaining the PCM, a manual used by CTI to document its policies and procedures, as well train new Analysts. He also participated in meetings to ensure that his group utilized the correct policies and procedures when preparing self-assessments of their compliance. (Id. ¶¶47-49).

## V.      PLAINTIFF WAS PROPERLY CLASSIFIED AS AN EXEMPT EMPLOYEE UNDER THE COMPUTER PROFESSIONAL EXEMPTION.

### A.      Plaintiff Qualifies As A Professional.

Plaintiff clearly met the requirements for an exemption under the FLSA and NYLL's computer professional exemption. To qualify for the professional employees' exemption, employees must receive compensation of at least $250 weekly on a salary or fee basis under the

old regulations and at least $455 weekly on a salary or fee basis under the new regulations.  29 C.F.R. §541.300(e) (old); 29 C.F.R. §541.300(a)(1).  The individual must also have as a primary duty the performance of work that requires knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction, or requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.  29 C.F.R. §541.300(a)(2)(new); 29 C.F.R. §541.300(a) (old).

Work requiring advanced knowledge is work that is predominantly intellectual in character, such as work that requires the consistent exercise of discretion and judgment, rather than routine mental, manual, mechanical or physical work.  29 C.F.R. §541.301(a).  Employees in professions who have substantially the same knowledge level and perform substantially the same work as degreed employees-but who attained the advanced knowledge through a combination of work experience and intellectual instructions…may still qualify for the exemption.  29 C.F.R. §541.301(c), (d).  The category of professional employees is one that will expand as knowledge is developed, academic training is broadened, and specialized degrees are offered in new and diverse fields.  29 C.F.R. §541.301(f).  Moreover, as new accrediting and certifying organizations are created and develop specialized curriculums and certification programs, employees who meet such requirements may qualify for the learned professional exemption.  Id.

Courts have found that individuals with computer certifications have the specialized type of learning necessary to qualify them as exempt under the computer professional exemption. Bagwell, 385 F.Supp.2d at 1319 & 1328 (finding plaintiff exempt under computer professional exemption based in part on plaintiff obtaining computer and networking certifications, including the CISCO Certified Network Associate ("CCNA")); Bobadilla v. MDRC, 03-CVI-9217, 2005

WL 2044938, at *7 (S.D.N.Y. Aug. 24, 2005) (finding plaintiff exempt under computer

professional exemption and noting that he "held a valuable CISCO CCNA credential that would

allow him to develop computer systems based on user specification").

Like the Plaintiffs in <u>Bagwell</u> and <u>Bobadilla</u>, Plaintiff had specialized networking

certifications – the interconnecting CISCO network devices ("ICND") and CCNA.  (SM ¶¶13-

15).  He utilized these certifications, as well as his advanced knowledge of cabling, infrastructure

and networking to perform duties as both a Lab Coordinator and Analyst.  (<u>See</u> <u>supra</u> at 8-11, 12-

14, 16-20).  Moreover, as set forth above, there is no question that at all relevant times Plaintiff

received more than $455.00 per week.  (<u>See</u> <u>supra</u> at 6).  Thus, he is a learned professional who

met the requirements of the professional exemption.

**B.    Plaintiff's Primary Duties Qualified Him As Exempt Under The Computer Professional Exemption.**

Computer systems analysts, computer programmers, software engineers or other similarly

skilled workers in the computer field are eligible for exemption as professionals under FLSA

sections 13(a)(1) and 13(a)(17).  <u>See</u> 29 C.F.R. §541.400(a).  To qualify under the computer

employee exemption, the employee's primary duty must consist of:

> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
>
> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
>
> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

(Id.)[10]

     The courts have concluded that the following tasks - all of which Plaintiff performed as a Lab Coordinator and/or Analyst– are exempt tasks under the computer professional exemption: 1) design and assurance of proper installation of cabling infrastructure; 2) consulting with clients regarding LAN design and technical specifications; 3) interacting with vendors; 4) maintaining detailed network documentation; 5) approving site installations of infrastructure and equipment; 6) recommending the purchase of network equipment, 7) taking a design plan, determining technical specifications, implementing the plan, and providing necessary following up; and 8) designing and implementing the build-out of a new network.  See e.g. Bobadilla, 2005 WL 2044938, at *5 (finding plaintiff qualified for computer exemption when he was hired to assist employer in build-out of network, specifically to design and implement the new network); Bagwell, 385 F.Supp.2d at 1327 (finding plaintiff exempt under computer exemption and recognizing that design, development or analysis of computer system as well as applying system analysis techniques to consult with users and determine hardware specifications are exempt duties); Bergquist v. Fidelity Info. Serv., Inc., 399 F.Supp.2d 1320, 1331-32 (M.D.Fla. 2005) (finding that taking design plan, determining technical specifications needed for plan, implementing plan, and following up on plan were all exempt duties under computer exemption).

     For example, in Bobadilla, despite plaintiff's argument that he performed a mere "Help Desk function," the court concluded that the plaintiff was exempt under the computer exemption,

---

[10]    Prior to the August 23, 2004 Amendments to the regulations, to qualify as a computer professional, an individual was also required to exercise of independent judgment and discretion.  Under the 2004 Amendments, to qualify for the computer professional exemption, an individual is not required to exercise independent judgment and discretion. Bergquist v. Fidelity Info. Serv., Inc., 399 F.Supp. 2d 1320, 1330 (M.D.Fla. 2005).  For the reasons set forth above, Plaintiff exercised independent judgment and discretion in both his role of Analyst and Lab Coordinator, and thus, he is also exempt under the pre-August 2004 regulations.  (See supra at 16-20).

and in doing so, it focused on his work involving the design and implementation of a new network:

> [The employer] sent Bobadilla to its California office, where he assisted in the installation of a network that would synchronize with [the employer's] New York network. The plaintiff was the only employee from the IT Department sent from New York for approximately one month to work on the build-out of the California network. [The employer] had never build out a network before the California project, and the plaintiff was hired, in part, to help [the employer] design and implement its new California local area network. Prior to launching the California network, meetings were held in New York to coordinate the project. The plaintiff was involved in those meetings…In California, the plaintiff configured machines so that they would operate in [the employer's] West Coast office, which required the plaintiff to access the operating systems for each network switch and each firewall, and input new routing configurations into device operating systems.

Id., at *5. Furthermore, in discussing Bobadilla's role in building up the new network, the court noted that "the plaintiff made actual, analytical decisions about how [the employer's] computer network should function…[i]n addition to installing and upgrading hardware and software, checking cables, and troubleshooting user connectivity problems…". Id., at *8.

Finally, the court recognized that an employee qualifies as exempt under the computer exemption if his primary duty includes presenting solutions, which would enhance the performance, upgrade, replacement, or combination of technologies, directed at the employer's technical infrastructure. Id. The court found that because the plaintiff analyzed existing network resources and determined that an underutilization existed and implemented configurations which provided for a network performance upgrade, plaintiff engaged in function that were exempt under the computer exemption. Id.

By way of another example, in Bergquist, the court agreed that the plaintiff was exempt where in his position as a computer programmer he received a business design from a business analyst, reviewed the business design, conducted intensive research to find out what technical steps were necessary and then designed and developed the program. 399 F.Supp. 2d at 1331.

24

For the reasons set forth below, Plaintiffs duties and responsibilities as a Lab Coordinator and as an Analyst were analogous to the duties and responsibilities of the plaintiffs in <u>Bobadilla</u> and <u>Bergquist</u>, and thus, he qualifies as exempt under the computer professional exemption.

### 1.    Plaintiff's primary duties as a Lab Coordinator qualified him as exempt under the computer exemption.

Similar to the plaintiff in <u>Bobadilla</u>, Plaintiff's "Key Job Responsibilities" as a Lab Coordinator included "Management of the CTI GE Lab Migration to Warren." (SM ¶¶54-69). In this capacity, and as stated previously, Plaintiff "[c]onsolidated/[m]igrated five major Citigroup Global Engineering labs to the Warren Facility…" (<u>Id.</u> ¶55). Plaintiff was the Lab Coordinator and CTI employee who primarily performed the function of coordinating the migration of the lab. (<u>Id.</u> ¶¶54).

In addition, drawing on his experience, Plaintiff performed multiple roles in the lab migration -- project manager, infrastructure technician, datacenter management and network integration. (SM ¶57). As part of the migration, Plaintiff was responsible for "[b]uil[ding] the network infrastructure to firewall the Warren GE Lab from Citigroup production network." (<u>Id.</u> ¶64). Moreover, after devising a plan for the layout of Warren, Plaintiff created the actual lab specifications. (<u>Id.</u> ¶¶60-62). Plaintiff also helped to develop the lab's new network by placing orders for equipment, installing the network, configuring the network, and ensuring proper network connectivity. (<u>Id.</u> ¶66).

Like the plaintiff in <u>Bobadilla</u>, Plaintiff also presented solutions to enhance the lab's technical infrastructure. (SM ¶75). Specifically, as part of his self-assessment, Plaintiff commented that, "[w]e actively request feedback from the Engineering community and try our best to utilize feedback to make everyone's life easier. Proactive efforts to address lab issues are always being made and the lab team is always trying to improve lab efficiency, stability, and

delivery." (<u>Id.</u>). Plaintiff also "[p]rovided input for Development Data Center policies and communicated them to [CTI] engineers, team, internal staff, business units and vendors." (<u>Id.</u> ¶83). Not only did Plaintiff provide input for Development Data Center policies, he "[w]orked with vendors and engineers to determine equipment environmental requirements prior to on site delivery." (<u>Id.</u> ¶79).

Finally, like the plaintiff in <u>Bobadilla</u>, Plaintiff "maintain[ed] good working relationships with representatives from eight different engineering disciplines whose requirements and priorities often contradict[ed] each other," and through these relationships, Plaintiff provided his insights and decision making authority not only to those within CTI but those outside CTI. (SM ¶74). Plaintiff's efforts to improve lab efficiency, stability, and delivery are analogous to Bobadilla's efforts and therefore qualify him as exempt under the computer professional exemption.

In addition, similar to the plaintiff in <u>Bergquist</u>, Plaintiff qualifies as exempt under the computer exemption because one of his primary duties was to design, plan and implement projects to ensure that all GE disciplines would remain fully viable. (SM ¶67). For example, Plaintiff was "responsible for gathering all the technical requirements from all GE disciplines to ensure that these groups would not lose any functionality / productivity when they move[d] to Warren." (<u>Id.</u>). In fulfilling this duty, Plaintiff effectively performed the tasks of at least four different teams -- Network Infrastructure, Network Integration, Datacenter Planning, Project Management Office. (<u>Id.</u> ¶57). Furthermore, Plaintiff "[u]tilized test equipment to ensure reliability of cabling and connectivity." (<u>Id.</u> ¶¶70-72). Plaintiff also maintained connectivity and Data Center evaluation databases. (<u>Id.</u> ¶81-82). Consequently, like the plaintiffs in <u>Bobadilla</u> and <u>Bergquist</u>, Plaintiff qualifies as exempt under the computer exemption.

**2.    Plaintiff's primary duties as an Analyst qualified him as exempt under the computer exemption.**

Similar to the Plaintiff in <u>Bobadilla</u>, Plaintiff's job functions as an Analyst included organizing and articulating compliance policies, including the Continuity of Business Plan and the PCM. (SM ¶¶45-49). In addition, Plaintiff addressed all TRAM (back-office computer system) related issues. (<u>Id.</u> ¶46). Plaintiff was also responsible for assessing port capacity and usage to determine if there was over or under utilization of port capacity. (<u>Id.</u> ¶26-27, 34). He was also responsible for reconfiguring ports so that they could be properly utilized. (<u>Id.</u>). In connection with installations, Plaintiff collaborated with engineering and network engineering teams on the proper placement, installation and configuration of network ports and took measures to implement network changes for the new network ports. (<u>Id.</u> ¶¶28-34, 37-43). Once Plaintiff configured the port, he would engage in network testing to ensure that he had established proper network connectivity by completing virtual local network ("LAN") configurations. (<u>Id.</u> ¶¶26-27). In connection with port configurations, Plaintiff was responsible for managing network capacity – proactively ensuring that when CTI needed to add a user it had proper capacity. (<u>Id.</u> ¶¶26-27, 41). In addition, when a port was no longer in use, Plaintiff used his knowledge and expertise to disable the port by implementing changes to the network. (<u>Id.</u>).

Like the Plaintiff in <u>Bergquist</u>, Plaintiff qualifies as exempt under the computer exemption because one of his primary duties was to assist in the design, planning and implementation of build-outs, user moves, adds and changes, and server installations in the Data Center. (<u>Id.</u> ¶¶28-34). For example, in connection with a build-out, Plaintiff would provide input to network engineering regarding virtual LAN structuring and make recommendations to engineering regarding equipment and cabling purchases. (<u>Id.</u>). In addition, Plaintiff's sophisticated knowledge of the interconnectivity of different cables was essential to the design,

planning and implementation of build-outs, moves, adds and changes because if certain wires were improperly merged or combined with one another, it could adversely affect network connectivity. (Id. ¶¶32-33). Moreover, when completing server installations in the Data Center, Plaintiff collaborated with engineers to determine the correct placement of new servers to ensure that they were properly connected to the correct network segment. (Id. ¶37-41). Consequently, like the plaintiffs in Bobadilla and Bergquist, Plaintiff qualifies as exempt under the computer exemption.

## VI.    PLAINTIFF WAS EXEMPT UNDER THE COMBINATION EXEMPTION.

Under the FLSA, employees who perform a *combination of exempt duties* (executive, administrative, professional, outside sales and computer) may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative work and exempt executive work may qualify for exemption. In other words, work that is exempt under one category of exemption will not defeat the exemption under any other category. 29 C.F.R. § 541.708 (new).[11]

For the reasons set forth above, there is no doubt that Plaintiff performed a combination of exempt duties under the administrative and computer professional exemption while he was both an Analyst and a Lab Coordinator. (See supra at 8-11, 12-14, 16-20, 25-28). Thus, he also qualifies as exempt under the combination exemption.

---

[11]    Under the pre-2004 amendments, an individual was also exempt under the combination exemption. However, the employee must meet the stricter of the requirements of salary and nonexempt work (i.e. the long test). 29 C.F.R. § 541.600 (old). Under the long test, an individual is exempt if he had primary duties consisting of the performance of office or non-manual work directly related to management policies or general or general business operations of his employer or his employer's customers; he customarily and regularly exercised discretion and independent judgment; he executed under only general supervision special assignments and tasks; and he spent no more than 20 percent of his hours in the work week on activities that are non-exempt work. See 29 C.F.R. 541.2 (a)-(d). For the reasons set forth above, Plaintiff clearly qualified as exempt under the long test.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff was exempt under both the FLSA and NYLL, and thus, the Court should dismiss his claims in their entirety.

Dated:  February 22, 2008                    Respectfully submitted,


By:   /s/ Sam S. Shaulson
Sam S. Shaulson (SS 0460)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York  10178
(212) 309-6000

Sarah E. Bouchard (Pa. I.D. #77088)
Sarah E. Pontoski (Pa. I.D. #91569)
*Admitted Pro Hac Vice*
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5387/5077/5059/5763