# EXHIBIT F

## DECLARATION OF PETER GARZA

I, Peter Garza, hereby make the following declaration under penalty of perjury under the laws of the United States. I declare that the facts stated herein are true, correct and within my own personal knowledge. If called as a witness and sworn I could and will competently testify to these facts.

1. I am a Senior Vice President with First Advantage Litigation Consulting ("FADV"), a firm specializing in computer forensics and electronic discovery. Prior to joining FADV, I was the founder and President of EvidentData, Inc. ("EvidentData"), a computer forensics firm located in Rancho Cucamonga, California. I have worked as a computer forensics expert in hundreds of civil litigation cases. I have performed analysis of computer evidence in enterprise environments which have included investigation of computer intrusions, human relations issues, theft of trade secrets and trademark infringement, along with criminal investigations for the FBI, the Securities and Exchange Commission and other state and local law enforcement agencies. In hundreds of cases I have worked, both as a federal agent during the 1980's and 1990's and since then as expert consultant, I have worked in enterprise computing environments. Both my staff and I work with computer network and systems professionals at every level on a daily basis. My graduate degree is in MSMIS (Master of Science Management Information Systems) from Claremont Graduate University. I have recruited and trained analysts with Information Systems degrees and have extensive experience in evaluating technical tasks and assessing technicians' and analysts' skill level. A true and correct copy of my resume is attached hereto as Exhibit 23.

2. In conducting my analysis, I reviewed the following materials:
   A. Deposition transcript of Amedeo Discepolo, dated February 20, 2008, with exhibits 1-12;
   B. Deposition transcript of Thomas Saranello, dated February 7, 2008, with exhibits 1-8;

C. Deposition transcript of Carmelo Millan, dated January 16, 2008, with exhibits 1-16;

D. Complaint and Jury Demand, case number 07 CIV 3769, May 11, 2007;

E. Citigroup Technology Infrastructure NISS Policies and Procedures Manual, dated April 10, 2003, Version 1.7;

F. Citigroup Technology Infrastructure NISS Policies and Procedures Manual, dated August 29, 2003, Version 1.8;

G. Amended Complaint and Jury Demand, case number 07 CIV 3769, September 21, 2007;

H. Defendants' Memorandum of Law dated February 25, 2008;

I. Defendants' Statements of Undisputed Facts, dated February 22, 2008;

J. Printout of CertCities.com article titled "Cisco To Launch New CCNA Exam, Add Two-Exam Option for Less-Experienced Candidates," dated June 23, 2003, attached as Exhibit 24;

K. Web page titled "Certifications Overview - IT Certification and Career Paths - Cisco Systems," printed March 12, 2008, attached as Exhibit 25;

L. Web page titled "CCNA - Career Certifications & Paths - Cisco Systems," printed March 12, 2008, attached as Exhibit 26;

M. Web page titled "ICND - IT Certification and Career Paths - Cisco Systems," printed March 12, 2008, attached as Exhibit 27; and

N. Fluke Networks brochure for MicroScanner Cable Verifier, downloaded March 12, 2003, attached as Exhibit 28.

3. Mr. Carmelo Millan worked for Citigroup Technology, Inc. ("CTI") and Citigroup, Inc. ("Citi") (collectively referred to as "Citigroup") from about June 2000 until March, 2007. Mr. Millan's resume lists his position as "Network

1  Analyst" with Salomon Smith Barney from June 2000 until January 2003. From
2  this position, Mr. Millan took the position of "Lab Coordinator" for Citigroup,
3  which he held until March of 2007. Review of the items referenced above reveal
4  that the technical aspects of Mr. Millan's work involved a level of technical skill,
5  but did not rise to the level of systems analysis which one would associate with
6  more advanced education and involving independent judgment and decision
7  making. Mr. Millan is obviously an accomplished technician who sought trade
8  certifications and was diligent at tasks assigned. My review of the documents
9  provided by Mr. Millan's counsel revealed that Defendants' characterization of Mr.
10 Millan's work attributed an exaggerated level of sophistication and incorrectly
11 implied elements of systems analysis to what are routine technical tasks which
12 adhere to established standards and requirements.
13    4. As an expert consultant in computer evidence, I have observed that what
14 are routine technical tasks to a computer technician may be perceived as overly
15 complex and sophisticated to a layperson unfamiliar with the industry. Defense
16 Counsel makes this mistake in the characterization of the Cisco ICND as a
17 "certification" and the CCNA as an "advanced networking certification." The
18 Interconnecting Cisco Networking Devices ("ICND") exam is not a certification, it
19 is a test administered as part of the Certified Cisco Network Associate ("CCNA")
20 certification. Cisco Systems, Inc. ("Cisco") is a manufacturer of enterprise
21 networking devices which also provides three levels of certification: Associate,
22 Professional, and Expert.
23    5. Defense Counsel accurately states in the Defendants' Statement of
24 Undisputed Facts dated February 22, 2008, that the "CCNA certification validates
25 an individual's *"ability to install, configure, operate and troubleshoot medium-*
26 *sized routed and switched networks, including implementation and verification of*
27 *connections to remote cities in a [Wide Area Network]."* This excerpt from the
28 Cisco Systems "CCNA - Career and Certifications" page (Exhibit 4 of Millan

1 deposition) cited by Defense Counsel goes on to state *"...curriculum includes basic*
2 *mitigation of security threats, introduction to wireless networking concepts and*
3 *terminology, and performance-based skills. This new curriculum also includes (but*
4 *is not limited to) the use of these protocols: IP, Enhanced Interior Gateway Routing*
5 *Protocol (EIGRP), Serial Line Interface Protocol Frame Relay, Routing*
6 *Information Protocol Version 2 (RIPv2), VLANs, Ethernet, access control lists*
7 *(ACLs)."* Even Defense Counsel's characterization of Mr. Millan's position
8 "telecommunications analyst" cannot change the fact that the CCNA certification is
9 not an advanced networking certification. The Cisco Learning website sited by
10 Defense counsel provides information about their three levels of certification. The
11 Associate level attained by completing the CCNA is
12 considered only slightly above the Certified Cisco Entry
13 Network Technician ("CCENT") shown in Graphic 1,
14 which shows Cisco's graphic representation of these lower
15 level certifications below the Professional and Expert
16 advanced-level certifications (Exhibit 4 Millan
17 Deposition). As indicated in Graphic 1, Mr. Millan's CCNA certification is only an
18 entry-level networking certification.

Graphic 1

19     6. On the Cisco web site cited by Defense Counsel during Mr. Millan's
20 deposition there is a page titled "Certifications Overview - IT Certification and
21 Career Paths" which states the following:

23 "Think of the Associate level as the apprentice or foundation level of networking certification."

25     7. Further, the Cisco Learning website cited by Defense Counsel lists a June
26 2003 article on the information technology ("IT") certification web site
27 CertCities.com titled "Cisco to Launch New CCNA Exam, Add Two Exam Option
28 for Less Experienced Candidates" pertaining to a new version of the ICND exam

1  for CCNA certification. This article emphasizes Cisco's intent to attract entry-level
2  candidates to the CCNA certification, and further illustrates that the CCNA is not
3  "advanced networking certification."
4      8. The long list of technical tasks cited by Defense counsel from the CCNA
5  certification web page are obviously not considered by Cisco as an advanced skill
6  set in their certification career path. All the tasks mentioned above from the CCNA
7  are well defined tasks that adhere to industry or Cisco standards. The CCNA trade
8  certification ensures that technicians are aware of set protocols for operating Cisco
9  networks. Whether it is configuring devices that route connections (switches and
10 routers) or working on the cable connections between network devices, the manual
11 technical tasks Mr. Millan describes in his deposition, which witnesses confirm,
12 and which Defense Counsel goes to great length to list, are a technician's set of
13 tasks in implementing standards or designs established by others. It is not to say
14 that Mr. Millan's tasks are not relevant or requiring a level of technical skill. They
15 do, however, lack elements of independent judgment or discretion nor do they
16 involve the application of systems analysis or design skills.
17     9. Defense Counsel explains Mr. Millan worked
18 on "diagnosing, troubleshooting and resolving
19 company-wide network problems." Among the tools
20 Defense Counsel lists are "butt sets." This simple
21 device, depicted in Graphic 2, also obtained from the
22 Cisco web site, is used by telephone repairman to test
23 connectivity in phone lines by clipping leads to a pair of
24 phone line contacts or wires. Along with other devices, listed by Defense Counsel,
25 or mentioned by witnesses, Mr. Millan performed set technical tasks requiring
26 knowledge of cabling and connectivity, but did not require Mr. Millan design a
27 solution to the problem. Mr. Saranello mentioned a Microscanner device used to
28 test cables in his deposition. This device is made by Fluke Networks. As Mr.



Graphic 2

1  Saranello testified, this device is used to verify that there were no faults in network
2  cables. This device uses a simple interface to allow technicians to do a battery of
3  tests. These devices merely test to determine if devices are operating within set
4  parameters, along with set trouble-shooting protocols Mr. Millan would apply
5  solutions established by Cisco or industry standards.

6      10. The technical tasks described by Mr. Millan, by witnesses and by
7  Defense Counsel are not the type of systems analysis tasks associated with
8  developing requirements with clients and designing a solution as a systems analyst
9  with an advanced degree might perform. My review of the documents provided by
10 Mr. Millan's counsel indicated to me that Mr. Millan did not make decisions
11 regarding the systems he supported. Engineers designed systems and as a
12 technician who tested cabling, for instance, he provided support to the engineer
13 regarding the physical run of cable that would be needed. As a carpenter might
14 provide feedback to an architect in the implementation of a design, so did Mr.
15 Millan apply his on-site knowledge in the physical execution of an engineer's
16 network design. Understanding the physical layout of a "stack" of computers in a
17 server room or the distance between network devices does not require a significant
18 amount of discretion. Either it was less than 330 feet, as Mr. Saranello points out in
19 his deposition, or was not.

20     11. Mr. Saranello testified about the established process of enabling and
21 disabling ports for devices on the network. Mr. Saranello explained that among the
22 tasks that network technicians did was to facilitate user's connections to the
23 network when changes were made. This involved working with other Citigroup
24 technical staff when, for instance, moving a user or group of users from one
25 physical location to another. Mr. Saranello related that as a network technician in
26 Network Integration with Salomon Smith Barney, he was tasked with enabling the
27 network connections for a user or groups of users. The tasks associated with
28 facilitating connectivity for devices on the Citigroup network was also a large part

1  of what Mr. Millan performed as Network Analyst and later Lab Coordinator. As
2  Mr. Saranello testified, this network connectivity involved creating a connection
3  from the device in question, for example a personal computer ("PC") on a user's
4  desk, to the Citigroup local area network ("LAN") which serviced the user's
5  physical location. In the most basic form, a cable is connected to the personal
6  computer, the cable runs to a hub. The hub may be connected to the broader
7  enterprise network via a router. The ports on the hub simply provide the connection
8  for the cable. The port looks much like a traditional phone jack only a bit larger.
9  Network cables have four pairs of wires (eight wires) compared to the two pairs of
10 wires in traditional telephone cables. The ports on hubs do not have settings which
11 can be used to manage the network. A network segment for an office or a floor of a
12 building is created by connecting cables to the hub and connecting the other end of
13 the cables to the devices. This creates a physical local area network.
14      12. In enterprise environments devices called managed switches, like the
15 Cisco devices described by Mr. Millan and the other witnesses, are designed to
16 allow operators to create more sophisticated networks with the software embedded
17 in the device. Like a hub, a switch has ports for connecting network cables which
18 connect devices on the network. The devices connected to a hub are on one LAN.
19 In contrast, a switch can separate connected devices into multiple LANs even
20 though they are physically connected to the same switch. By using settings in the
21 software on the switch, groups of devices are
22 separated into virtual local area networks
23 ("VLAN"). The device depicted in Graphic 3 is a
24 Cisco 5500 switch. This type of switch is among
25 the types of devices Mr. Millan supported. Mr.
26 Millan and other witnesses testified that his duties
27 involved verifying the cables that plugged into this
28 type of device and they also included requesting



Graphic 3

changes to the settings on these switches. Changes involved the network addresses assigned to the ports or simply turning them off and on. Mr. Millan testified that the ability to make these simple changes in the Cisco switches was removed his duties and responsibilities early in his position as Network Analyst. Mr. Millan testified he entered these changes in a database used to track these settings.

13. Mr. Millan's duties as a Network Analyst and Lab Coordinator with Citigroup did not involve systems analysis or design of the network in which devices like this Cisco switch were incorporated. His duties were lower-level technical support functions to ensure that the physical equipment that attached the devices on the Citigroup network operated within set parameters and according to set procedures. Even in Mr. Millan's later position as Lab Coordinator, his technical role was supporting the physical connectivity of the network, which involved a higher number of devices, but did not change the technical level of his duties.

14. Mr. Discepolo testified that one might consider the tasks Mr. Millan performed in spreadsheet-lists of "inventory and the elevation drawings and the connectivity database" as programming. This is simply incorrect. Programs like Microsoft Excel, which Mr. Millan used for these tasks, are simple to use programs requiring only basic skills for the most common tasks, like creating lists of inventory. I have used Microsoft programs for many years and have used systems analysis tools to design databases and database applications (programs that provide a user interface to databases) and know that Microsoft Excel is not this type of program. Nor is Microsoft Excel a programming environment. I have performed systems analysis and design work executed by programmers in programming environments. Although programs can be written by users that interact with Microsoft Excel, the simple tasks mentioned in Mr. Discepolo's testimony clearly do not involve any programming.

15. I reviewed the performance evaluations of Mr. Millan, Mr. Millan's resume, the deposition testimony of witnesses along with Defendants' Statements of Undisputed Facts and observe that Mr. Millan's technical duties with Citigroup, both in his earlier position as a Network Analyst and later as a Lab Coordinator involved low-level technical functions. Although Mr. Millan had begun the process of obtaining computer trade certifications, technicians in this type of position at Citigroup were not required to possess those certifications. The CCNA certification he had obtained is considered by the industry leader, Cisco, as an entry-level certification involving the types of technical tasks Mr. Millan performed at Citigroup. The work Mr. Millan performed as a computer employee with Citigroup did not involve systems analysis techniques or procedures. Although Mr. Millan did consult with users, it was not to determine system specifications. Mr. Millan's interaction with users was in the application of well-established procedures and industry standards applied to the placement of network devices and resolving connectivity issues.

16. Mr. Millan's duties with Citigroup did not involve computer systems design. In the material I reviewed it was clear to me that Mr. Millan may have reviewed network designs prepared by network engineers and provided input regarding his knowledge of the physical placement of devices, however, he did not create the network designs or specifications. Nor did Mr. Millan's duties have any involvement with the design, documentation, testing, creation or modification of computer programs related to machine operating systems. It is clear that the combination of duties Mr. Millan performed for Citigroup required a level of technical skill, but did not rise to the level of computer systems analysis or engineering.

//
//
//

1  I declare under penalty of perjury that the foregoing is true and correct. Executed at
2  Rancho Cucamonga, California on this 14th day of March, 2008.

_____
Peter Garza