# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARMELO MILLAN, individually, and on Behalf of All Other Persons Similarly Situated     Plaintiffs | : CIVIL ACTION : : : : |
| vs. | : : : |
| CITIGROUP, INC., CITIGROUP TECHNOLOGY, INC.     Defendants | : : : NO. 07-CIV-3769 |

----------
Wednesday, January 16, 2008
----------

Deposition of CARMELO MILLAN, taken pursuant to notice at the law office of Morgan, Lewis & Bockius, LLP, 101 Park Avenue, New York, New York, on the above date, beginning at approximately 10:00 a.m., before Charles P. Carmody, Registered Professional Reporter and Notary Public.

-----------------------------------------------
CHARLES P. CARMODY & ASSOCIATES
Court Reporting Services
P.O. Box 525
Ambler, Pennsylvania  19002

(215) 646-2599 * deposition1@verizon.net

CARMELO MILLAN

Page 2

```
1    APPEARANCES:
2

3       LOCKS LAW FIRM
        BY:  JANET WALSH, ESQUIRE
4            110 East 55th Street, 12th Floor
             New York, New York  10022
5       Representing the Plaintiffs
6

        MORGAN, LEWIS & BOCKIUS, LLP
7       BY:  SARAH E. BOUCHARD, ESQUIRE
             SARAH E. PONTOSKI, ESQUIRE
8            1701 Market Street
             Philadelphia, Pennsylvania  19103
9       Representing the Defendant
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1  the network, cabling, installing hardware, right.  So
2  essentially I served in that capacity while I was in
3  network integration.
4          They realized that it was costing them too
5  much money due to the frequency of their changes.
6  Since it was a lab facility, they were receiving
7  equipment all the time, evaluating it in three-month
8  cycles and returning it, right.
9          So they created a position to support the lab
10 within global engineering.  I went into that position.
11 They gave me a network engineering title.  But in
12 essence, I was actually supporting the lab from the
13 same perspective, from a cabling, installation, you
14 know, helping them facilitate through a testing
15 standpoint.
16 Q.      I'm going to be asking you some more job
17 duties a little bit later.
18 A.      That's fine.
19 Q.      Was Naseer doing the same job duties as you?
20 A.      Correct.
21 Q.      I understand that you had responsibility for
22 the integration of the Warren lab.
23          Was he responsible for that?
24              MS. WALSH:  Objection to the form

1      on and so forth, right.
2  BY MS. BOUCHARD:
3  Q.      Were you selling Citigroup products?
4  A.      No, I wasn't selling Citigroup products.
5  Q.      So you were supporting those people that sold
6  Citigroup products through your support of their
7  computer systems, correct?
8              MS. WALSH:  Object to the form.
9              THE WITNESS:  I was supporting
10     computer networks.  What the people did over the
11     computer networks, I wasn't necessarily aware of
12     because there was a lot of different departments
13     within Citigroup.
14           The nature of their business really
15     wasn't my concern.
16 BY MS. BOUCHARD:
17 Q.      But you weren't in the business of selling
18 Citigroup or CTI products, your job responsibilities?
19 A.      My job responsibility is to support the
20 network from a connection and connectivity standpoint,
21 right.
22 Q.      Did you ever take any leaves of absence when
23 you were working there?
24 A.      No.

1   no sense to me, right.
2   Q.          That wasn't my question though, okay.  I
3   appreciate that answer.
4               But my question was, did you ever tell
5   Mr. Holder after you read these key job
6   responsibilities that these job responsibilities are
7   misleading, these are not my job responsibilities?
8   A.          It was not relevant.  So I didn't take it in
9   that context.
10  Q.          The question is, did you ever tell
11  Mr. Holder, I don't agree that these are my job
12  responsibilities?
13              It's a yes or no question.
14  A.          I'm actually reflecting, right, upon
15  conversations we had regarding the review, right.
16              I wouldn't specifically be able to tell you
17  regarding this review.
18              But I knew throughout the course of our
19  professional relationship, I constantly asked Paul to
20  give me a proper job description -- on several
21  occasions, I asked Paul and Amedeo to give me proper
22  job descriptions, right, because the amount of
23  responsibility being thrown at me, right, pretty much
24  superceded, right, like what I was able to do based on

1    the staffing and my support responsibilities, right.
2              So I might quite possibly had that
3    conversation with Paul, not directly in regards to this
4    review. I wouldn't be able to tell you that.
5              I can't recall if specifically I spoke to him
6    about this review, right, but I know that I had the
7    conversation with him about my job responsibilities in
8    general.
9    Q.        Can you turn to page 4 of 5 of this document?
10             I'm looking at the section titled, "Overall
11   Performance Summary."
12             In the overall performance summary box, it
13   says, "Carmelo has been able to maintain good working
14   relationships with representatives from eight different
15   engineering disciplines whose requirements and
16   priorities often contradict each other."
17             Did you agree with that statement?
18   A.        Yes.
19   Q.        The next paragraph says, "Carmelo continues
20   to be an integral part of CTI Global Engineering
21   efforts and successes. The scope of Carmelo's job has
22   increased significantly over the last six months. In
23   addition to his overwhelming day-to-day
24   responsibilities, he assumed responsibility for the

1  paying for different cabinets or different areas within
2  the lab, right.
3          Based on that, they would divvy up space,
4  they managed their space, they told me whether I can
5  use their space to install the equipment or not. And
6  essentially, I was just going back and forth, right,
7  with them figuring out where equipment needed to be
8  installed, right.
9  Q.     Did you assume responsibility for the
10 build-out of the Warren lab facility?
11 A.     Not completely.
12         I mean, it was done -- for the aspects that
13 pertain to me as far as my job function was concerned,
14 right, and being able to move the existing lab facility
15 from 388 Greenwich to Warren, the equipment that I
16 supported, yeah, I took responsibility for that aspect
17 of it, yeah.
18 Q.     You never told Paul Holder that you disagreed
19 with that portion of your performance review?
20              MS. WALSH:  Objection to the form.
21              THE WITNESS:  Maybe I should
22     elaborate on exactly what was taking place,
23     right.
24              We had a couple of hundred computers in

1   the 388 Greenwich facility that I supported,
2   right.  Those computers needed to move from 388
3   Greenwich to the Warren lab facility, right.
4        In order for them to move to the Warren
5   lab facility, right, they needed input as far as
6   what type of cabling would be necessary, what
7   type of facilities would be necessary, the amount
8   of cabinets that were necessary, based on our
9   existing setup, right.
10       So I assisted in collecting information,
11  right, and provided this information to the
12  appropriate people.
13       There were teams of people working on
14  these projects, right.  There was various labs.
15  If I'm not mistaken, they were building out 18
16  labs within the Warren facility, right.
17       So the equipment that I supported needed
18  to get to Warren, right.  Global engineering,
19  right, wasn't -- the project for whatever reason,
20  was really -- I didn't have enough experience at
21  the time, right, to determine exactly what was
22  going on.
23       I was taking direction from Paul, Amedeo,
24  Yesim Akdeniz, as far as what I needed to be

1  doing.
2          So I was doing my support
3  responsibilities.  And then on top of it they
4  were like, look, we need to move the lab to
5  Warren, right.  So, you know, help us, you know,
6  gauge what needs to happen to make that occur,
7  right.
8          It wasn't my primary job responsibility,
9  I wouldn't say, right, because my primary job
10 responsibilities and my reviews were based on the
11 lab being up and functioning.
12         If I walked in on any given date and the
13 lab was down, right, from a connectivity -- a
14 network connectivity standpoint, or the requests
15 that were taking place in the lab weren't being
16 processed and equipment wasn't getting installed,
17 right, that was my primary evaluation.
18         That's what I was primarily held to in
19 addition to all these other, like, information
20 gathering exercises that I performed, right, and
21 helping them gauge what they needed within the
22 facility at Warren, right.  That's what this is
23 relevant to.
24         So essentially we had a lab in 388

1   Greenwich. The lab needed to move to Warren. I
2   supported the lab, right. The lab wasn't going
3   to move if I didn't help them do it, right. And
4   they asked me to assist them in it.
5   BY MS. BOUCHARD:
6   Q.        Did Naseer have the same responsibilities
7   with respect to the build-out of the Warren lab
8   facility?
9   A.        He helped in the information gathering
10  process. He helped to stage the equipment prepare
11  sheets, gather information, yeah.
12  Q.        At some point did you have a dispute with
13  Naseer?
14  A.        Yeah. I don't think it's relevant to this,
15  but, I mean, what would you like to know about it?
16  Q.        What was your dispute with Naseer?
17  A.        Essentially, me and Naseer were coworkers.
18  And Naseer tended to go on vacation, takes days off,
19  and do other things that would affect my workload
20  within the lab.
21            So being that there was only two technicians
22  within the lab that were supporting lab requests and
23  supporting the lab in general --
24  Q.        You and Naseer?

1              MS. WALSH:  Are you referring to
2     when he was a telecommunications analyst, or when
3     he was at the lab?
4  BY MS. BOUCHARD:
5  Q.         In 2001.
6  A.         I mean, the interaction, the way it took
7  place, right, was sometimes people would call the help
8  desk, sometimes people would call the system
9  administrators, and sometimes people would call us.
10            We all had, essentially, hotlines, right,
11 that ran to the entire group.  So I don't understand
12 what the nature of your question is like.
13 Q.         My question is, did you know of people that
14 worked there in 2001, that were help desk personnel?
15 A.         I knew that we had a help desk, yeah.
16 Q.         Do you know approximately how many people sat
17 at that help desk?
18 A.         No.
19 Q.         What's your estimate?
20 A.         I have no estimate.  I don't know how many
21 people sat there.
22 Q.         I believe your previous testimony, correct me
23 if I'm wrong, is that once a call came into the help
24 desk, you would get a trouble ticket from them?

1  A.         Again, as far as --
2  Q.         It's a question.
3  A.         What was the question?
4  Q.         Well, if you come in late and you leave
5  early, that's going to further cause workload problems
6  for you, isn't it?
7                    MS. WALSH:  Objection to the form.
8                    THE WITNESS:  I mean, we had the
9          ability to work remotely, so on and so forth.  So
10         it wouldn't necessarily be indicative of the
11         hours that you were spending in the office,
12         right.
13                    Like there was a lot of data entry work
14         involved with what we were doing, right.  So it
15         wasn't necessarily indicative of the amount of
16         time that you were spending working, right.
17 BY MS. BOUCHARD:
18 Q.         Did you tell your supervisors that you were
19 working from home and that you shouldn't get the
20 performance review?
21 A.         I couldn't correlate the days, right, to the
22 time I received the review.
23                    At that point in time, to be quite honest,
24 when I had received the write-up from him, all right,

1   I don't know where to turn.  I don't know what to do,
2   essentially, right.  I was overwhelmed by the
3   situation.
4           So really, as far as I was concerned, I was
5   like, all right, you're going to be letting go of the
6   consultants, you know.  Like this situation is
7   obviously spiraling out of control.
8           We've had this conversation on and off,
9   right, about this place needing to be staffed better,
10  right, for us to perform what it is you want us to
11  perform down here, right.
12          Like, I was up in arms about it.  So I didn't
13  really give it much thought.
14  Q.      In the manager comments, it says:  "The
15  semi-annual lab access review had not been completed to
16  date, and as such puts us at audit risk for not
17  following our PCMs."
18          Do you see that?
19  A.      Yes.
20  Q.      At least your manager thought that that was
21  your responsibility; isn't that correct?
22                  MS. WALSH:  Objection to the form.
23                  THE WITNESS:  Again, at this point
24      in time I was asking him for a written job

CARMELO MILLAN

Page 120

1  Q.    What's been marked as Exhibit 9 is a pay
2  period record from the last pay period in 2006. And it
3  reflects that your total wages to date were $74,448.58.
4        Do you see that?
5        That's at the Total column.
6  A.    Yeah.
7  Q.    It states your employer -- it's in sort of
8  the middle piece of the page.
9        Do you see that?
10 A.    Yeah.
11 Q.    It says, Citigroup Technology, Inc.?
12 A.    Yeah.
13 Q.    Your regular wages were about $2,500 per
14 week; is that correct?
15 A.    Yeah.
16 Q.    Yes?
17 A.    Yes.
18 Q.    Or that might be pay period, I'm sorry, since
19 it's a two-week period.
20       I didn't mean to misrepresent that.
21 A.    It was bi-monthly.
22 Q.    Bi-monthly, okay.
23            (Whereupon, a discussion was held
24      off the record.)