UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CARMELO MILLAN, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>      Plaintiff,<br><br>  vs.<br><br>CITIGROUP, INC. and CITIGROUP TECHNOLOGY, INC.,<br><br>      Defendants. | Civ. Action No. 07-CIV-3769 (AKH) |

### DECALARATION OF CARMELO MILLAN IN SUPPORT OF PLAINTIFF'S OPPOSTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Carmelo Millan, declare as follows:

1.  I am the Plaintiff in the proceedings before the Court.

2.  I worked for Citigroup Technologies, Inc. ("CTI") and Citigroup, Inc. ("Citi") (collectively "Citigroup") from June 2000 to March 2007.

3.  When I started at Citigroup, my official title, as well as that of all other employees in my group was Telecommunications Analyst. However, we, and other employees throughout Citigroup, were commonly known as network technicians, technicians or "techs".

4.  The department in which I worked was called Network Infrastructure Site Support ("NISS"). I reported to Richard Braunagel, Team Leader from June 2000 to sometime in 2002, after which I reported to Thomas Saranello. Mr. Saranello continued to be my team leader until December 2003.

5.     When I worked in the NISS Group, the group was responsible for the

installation and maintenance of network connectivity for Citi's Global Corporate

Investment's Bank network and all related devices.  (See NISS Process Control

Manual ("NISS PCM"), attached hereto as Exhibit 1, at 4.)

6.     Garfield Spence was the Vice President in charge of the NISS Group.  As seen

in the April 2003 organization chart (Ex. 1 (NISS PCM), at 5), there were two teams

(approximately 22 technicians) responsible for network connectivity.  These two

teams, headed by Thomas Saranello and Richard Braunagel, were assigned to cover

different sites and each technician within the group, although performing the same

basic duties and responsibilities, was assigned to a specific site or sites.  (Id.)

7.     My day-to-day duties and responsibilities as a technician involved the

following:

   a.   Responding to trouble tickets generated through the Global Problem

        Management System ("GPMS"). These tickets were used by Citigroup

        employees to report an issue with network connectivity. (Ex. 1 (NISS

        PCM), at 16-21).

   b.   Processing Customer Service Requests ("CSR") through a system called

        ComTrack. Citigroup employees used CSRs to request network

        connectivity changes, such as a move from one location to another, adding

        another device, etc.  A CSR was assigned to a Team Lead who then

        distributed the work to a technician.  (Ex. 1 (NISS PCM), at 21);

   c.   Processing the Infrastructure portion (i.e., the manual labor portion) of a

        Technology Asset System ("TAS") request.  The TAS system was used by

Citigroup employees to request server installations. There were a number of different steps involved in a TAS request. The first step included properly allocating space and power; this initial step was performed by the Infrastructure Engineering Group. The second step included determining valid network segments and configuring switch slot/port and terminal server connectivity; this second step was performed by the Network Integration Group. The final step involved physically installing the hardware and cables, testing the connection, labeling the equipment and entering the appropriate data into an existing database. It was this final, manual labor task that was assigned to a technician, such as myself. (Ex. 1 (NISS PCM) at 11-15)

d.  Processing the Infrastructure portion (i.e., the manual labor portion) of requests made through Infoman, a system used by the Infrastructure group to schedule network changes that required physical cabling infrastructure changes or the support thereof. (Ex. 1 (NISS PCM) at page 22-26.)

8.     The work that I performed in connection with each of the above systems, GPMS, ComTrack, TAS and Infoman, was identical. I actually installed or uninstalled cables, which connected at one end to an electronic device and, at the other end, to a port -- or outlet-- which provided a connection to a company network. Then, I used a pre-calibrated testing device to ensure that the network connection was established. After physically connecting these cables, I labeled the equipment with an appropriate name or number based upon the standard nomenclature used by CTI. Then I enabled the appropriate port on the switch (a piece of hardware that contains

multiple ports).  Finally, I entered information into pre-set fields in a database or spreadsheet to document the connection.   I also performed troubleshooting with respect to these connections.  Most of this work was of a manual nature which involved me working with my hands, moving and lifting equipment and running cables.

9.      The various testing devices that I used when I worked as a technician included:

    a.   A fluke meter, which is a handheld device that you plug into a port.  Once plugged in, you press the start button and the fluke meter tells you if there is a live connection, the speed of the connection and which network you are connecting to.  I used this on a daily basis to test connectivity;

    b.   A fiber tester, consisting of a transmitter and receiver, was used to test connectivity on fiber optic lines.  The transmitter is connected to one end of the cable and the receiver to the other end and the tester indicates whether there is a live connection;

    c.   Mod Tap, which is a testing device for copper cables. This works the same way as a Fiber Tester, but tests a pair of cables;

    d.   Butt Set, which looks like a telephone and attaches by alligator wires to a cable.  Once attached, you listen to confirm that there is a live connection.

10.     All of these testing devices were preset and simple to use.  In fact, an inexperienced person could learn to use these devices properly in less than an hour.

11.     For all of the work I performed, I followed well established techniques procedures and specific standards established in the industry or in Citigroup.

12.     The actual procedures I performed were established before I joined the NISS group.  There were various documents which contained standard instructions with respect to the various cables and other components with which I worked.  Each of the systems described above in ¶ 7 above had instructions that needed to be followed with regard to processing a request.  In or around 2001, the NISS PCM was created for the group by John Franzitta, Thomas Saranello and Richard Braunagel (Ex. 1 (NISS PCM) at 1).  The NISS PCM consolidated all of the various processes and procedures that we followed to perform our job into one central document.   It provided detailed instructions on how technicians were to perform assignments. The PCM also included all of the standards that were required for the various cables and devices that we worked with.  I and other technicians followed its directions when performing our daily tasks.   The PCM was given to all new technicians as part of the training they received to perform their duties and responsibilities.

13.     When I first started working as a technician,  my training consisted of spending approximately two weeks with two other techs, following them to assignments and watching what they did.  I also spent one other week with a senior technician trailing him and observing the work he performed.  Most of what I learned during this three week training period related to learning about documenting work performed, the databases used, the fields that needed to be filled in on these databases and the CTI specific nomenclature that was used for completing the documentation. I learned how to perform the physical cabling and installation work, on the job, in about a month.

14.    In addition to the above described duties and responsibilities, (which I performed on a daily basis), I also did various other tasks at various points while I worked as a technician.

15.    For example, when I first started, part of my job (and that of the other technicians) was to set port speeds on switches or disable them if there was no longer a need for a connection.  I would do this, if an employee moved to a different location and no other employee was replacing him or her at the original location.  In that instance, the technician would log into a Cisco switch via telnet (a system used to access network devices from any machine connected to the same network) and check or set the appropriate speeds or Virtual Lans via the Cisco IOS "show port", "set port", and "set vlan" commands. Instructions with regard to using telnet are contained in the NISS PCM.  (Ex. 1 (NISS PCM) at 29-33).  This involved knowing three or four simple commands that were standard and easily learned.

16.    However, following a Citigroup audit, it was determined that technicians at our level should not be permitted to perform this task.  Instead, when a port change had to be made, I needed to complete a Layer 2 Switch Port Change Request, which I submitted to the Global Network Connectivity Control group ("GNCC").  (Ex. 1 (NISS PCM), at 36-38).

17.    Approximately three years after I started with the group, my Team Leader assigned me the task of maintaining the NISS PCM.  The NISS PCM was typically updated on a quarterly basis.  (Ex. 1 (NISS PCM), at 4).  Whenever the PCM needed updating, my supervisor, Mr. Saranello, advised me what information needed to be added or edited and I would follow his directions as appropriate.  (See e.g., attached

6

as Exhibit 2, three e-mails from Thomas Saranello to Carmelo Millan, dated May 6,

2003, May 30, 2003 and July 14, 2003). After editing the PCM, I submitted my

changes to Mr. Saranello, Mr. Braunagel and Mr. Spence (the head of the NISS group

and Mr. Saranello's and Mr. Braunagel's superior) for review and approval. Once

approved and/or edited by my superiors, it became part of the NISS PCM. This

editing did not involve me creating or designing new processes or procedures. At

most, if asked, I wrote down details of the procedures I followed in completing a task.

I exercised no independent judgment in completing this task and did not have any

discretion to determine the content of the NISS PCM, other than for example,

amending someone's phone number.

18.     In or about the end of 2003, Citigroup's Compliance Department required that

NISS convert its PCM to follow the structure of that used by CTI in its other Process

Control Manuals. (See, attached as Exhibit 3, an e-mail from Thomas Saranello to

Carmelo Millan, dated August 1, 2003). I worked on this project with Mr. Saranello

and Patti Scarda from the Compliance Department. To implement the changes that

were required by Citigroup, I followed the instructions I received from my supervisor

and Ms. Scarda.

19.     At around this same time, I was also assigned by my supervisor to work on

two other documents, the Continuity of Business Plan ("COB") and the Facility

TRAM, based on instructions I received from the Compliance Department. As with

the NISS PCM, I took my instructions from Ms. Scarda. The framework for both

documents was provided to me with much of the information already completed. I

inputted what I could and requested information I did not know from my superiors.

Again, this task involved no exercise of independent judgment and was essentially a data gathering and data entry function. (See e-mail from Carmelo Millan to Garfield Spence, copied to Thomas Saranello and Richard Braunagel, dated September 9, 2003, attached as Exhibit 4). Once I completed the draft of these documents, I submitted them to my supervisors and Ms. Scarda. I did not have final approval authority with respect to the content of either document.

20.     I was also assigned to complete information on a questionnaire that was distributed by the Compliance Department called a Risk Self Assessment. Again, this involved answering specific questions posed by the Compliance Department. For example, the questionnaire asked questions like, "Are the garbage cans in the Data Center combustible or non-combustible?" and "Are there any obstructions within 12 inches of the ceiling?" If I did not know the answer to a question, I would consult with my superiors and would submit the document to them for review prior to submission to the Compliance Department. This questionnaire was completed once a year.

21.     The work I performed on the NISS PCM, the COB, the Facilities TRAM and the Risk Self Assessment never accounted to more than 10 and 20 % of my duties and responsibilities during the time I worked on them. During this period, my primary duties always involved the physical installation of hardware and cabling to ensure network connectivity. This is supported by my 2002 and 2003 Year-End Performance Evaluations (attached as Exhibits 5 and 6 respectively) which confirm that I completed 859 and 760 ComTrack tasks in each year respectively. This is a significant number for any technician and would not have been possible to

8

accomplish had most of my time or even a more significant amount of my time been taken up with administrative duties.

22.    As a technician in NISS, I regularly worked more than 40 hours in a work week and occasionally worked more than 60 hours per week. (See extract from Citigroup's Time Recording System, attached as Exhibit 7).

23.    During the time I worked as a technician in NISS, I obtained a certification called the CCNA or Cisco Certified Network Associate, which included taking the ICND (Interconnecting Cisco Networking Devices) examination. The ICND is not a separate certification. I obtained the CCNA certification on my own time, through self-study and it was not required for my position. For the most part, the coursework required to obtain this certification was not related to my duties and responsibilities at Citigroup. I did not perform any additional tasks that my co-workers without the CCNA certification could not do. I took the CCNA and obtained the certification as part of my plan to advance my career in technology.

24.    I did attend college for almost 2 years but did not obtain a Bachelor's Degree or an Associate's Degree. These were not required for the position of technician.

25.    After leaving Citigroup, I prepared a resume describing my duties and responsibilities as a technician, in language that was as impressive as possible, without misrepresenting my experience. (A copy of my resume is attached as Exhibit 8, "Millan resume".) Thus, what might seem like advanced duties to someone unfamiliar with the job I was doing, anyone with knowledge of networking would know that they were merely basic support functions relating to network connectivity.

26.    The following is an explanation of each bullet point contained on page 3 of

my resume relating to my position as a technician.

a. **Handle Help Desk calls regarding network and network connectivity issues as well as application issues**: This relates to troubleshooting network connectivity issues as described in ¶¶ 7-10 above. As far as my involvement in application issues, this was only as it related to network connectivity and involved troubleshooting a user's network connection if they could not access any of their applications.

b. **Handle network connectivity and software checkout aspects of Moves, Add and Changes to the company network**: A Move is a relocation of a group of Citigroup employees from one site to another. An Add is where additional Citigroup employees are joining an already existing group and require network connections. A Change is where an employee or employees may be switching to new devices that require the change over of the network connection. Moves, Adds and Changes are also referred to in the industry as MACs. With regard to the "software checkout aspect", all this really means is that, for example, after a move was completed, I would remain on site while the Citigroup employee checked his or her software to ensure that it was functioning. If it was not, I made sure that it had nothing to do with the cabling and network connection I had installed. If the problem related to something other than the network, I referred the employee to the next level of support for assistance.

c. **Conduct proactive internal/external escalation, trouble ticketing and reporting for 38 floors in a mixed DHCP/static, 10/100 switched Ethernet, gigabit backbone environment**: I was assigned to the 388 Greenwich Street building (which had 38 floors that NISS serviced), along with a number of other technicians. The description of the actual environment refers to the type of connections we were dealing with – all standard within the industry. "Proactive internal/external escalation", refers to, when I reviewed trouble tickets, if I noticed there were a number of network connection problems in one particular area, I would inform my supervisor so that the appropriate group could be informed to handle the situation. This might be an indication of an outside provider's circuit being down.

d. **Rack/Stack, troubleshoot, test and support 2500, 2600, 4000, 7500, & 8500 series routers and 5500, 6500 series switches in production and pre-production environment**: Racking and Stacking refers to unboxing and installing computer or network equipment in the appropriate cabinet or rack with screws. The relevance of the numbers on the routers and switches related to their actual size and whether they would fit in the space allocated for them.

e. **Participated in installation and activation of all equipment in Data Center and Comm Closet:** The Data Center is the central point of distribution for all voice and data services such as network connections and phone service. The Data Center houses big equipment like servers, network routers, switches and circuits. All cables providing network connection originate at the Data Center. I performed work from time to time (on average about once a month) that involved me working in a Data Center.[1] This work was always according to specifications received from the engineering department and reviewed by other departments before being assigned to technicians. In fact, the work in the Data Center was more physically challenging because the equipment that needed to be moved was bigger and there were more cables, in a smaller space. However, the work I did in the Data Center was essentially the same as the work I performed on the floors and did not involve any greater degree of knowledge. I still followed the same standards, techniques and procedures. The Comm Closet is a community closet of which there are two located on each floor which serve as a distribution point for voice/data and network services. The Comm Closet is an intermediate point between the end user floors and the Data Center. If another group needed access to the Comm Closet, a technician from my group had to chaperone other Citigroup employees to ensure that they did not unplug the wrong cables and that any connection changes were documented.

f. **OC3, ISDN, T1/T3, Frame Relay, Analog circuit installation, extension, termination & troubleshooting**: This refers to the various types of cables that were used at Citigroup for establishing network connections. As a technician, all information that we needed to know regarding these cables was contained in the NISS PCM. (Ex. 1, (NISS PCM), at 41-45). These are all standard cables used in the industry.

g. **Created and implemented Salt and Peppering schemes to provide desktop, server, and network redundancy**: A Salt and Peppering scheme involves alternating the ports used to connect cables so that if there is a hardware problem, only every other network connection in a given area will be affected. My supervisor Richard Braunagel showed me how to create a Salt and Peppering Scheme and explained to me why it was used in the industry. After that, I routinely used this scheme when connecting cables to ports based upon the technique that Mr. Braunagel had shown me. This practice is an industry-wide standard. I was not aware of how to do this or the reasoning behind it until Mr. Braunagel explained it to me.

---

[1] As a technician, I was assigned to cover the 388 Greenwich Street building which did not have a Data Center. My work in the Data Center was at 390 Greenwich Street which was assigned to other technicians and I would help out when required.

h. **Worked with Network Operations, Engineering, Integration, as well as company business units in diagnosing, troubleshooting & resolving company wide network problems:** There were several layers involved in addressing network issues within Citigroup. As a technician, I regularly interacted with other, more senior groups in the performance of my duties and responsibilities. Typically, with regard to MACs or Build-Outs, (a move or expansion of a Citigroup department which resulted in the provision of additional network connections), a project manager would be assigned from the Project Office for CTI. The first stage of the project involved the Engineering Team creating a design plan. The Engineering Team would decide what IP address space to allocate and which service providers to be use, ie. Sprint, AT&T, etc. The complete design plan is then given to the Applied Engineering Department for review. The Integration Team was then responsible for purchasing the equipment and the implementation of the plan. The plan is then passed on to GNCC, to again review the information to ensure that it is accurate and complete. My supervisor was typically involved at the implementation level. Finally, once all these steps have been gone through, a technician like myself would be assigned to perform the manual work involved in providing the connection. I had no input into the design, layout, etc. of the project. I did attend meetings with regard to build-outs and MACs. I typically contributed nothing during these meetings. The purpose of my attending generally related to the scheduling of the project – when it was actually going to occur. Occasionally, if there was a piece of information missing, I would need to ask a question for clarification. For example, if a Move was taking place and an employee had two connections at their current desk but the new desk was only showing one connection on the plan, I would ask the engineers if that was correct. Also, if there was some information missing from the Move Sheet (the sheet I would use to implement the plan) for example, a location code, I would ask for that information.

i. **Tested different media types with different testing devices including but not limited to butt sets, fiber testers, Mod-Taps, and Fluke meters:** These testing devices I described in detail at ¶9 above.

j. **Responsible for creation, maintenance, and accuracy of all network connectivity related databases/worksheets**: As indicated above, as a technician, I was required to document the connections I created in a database or worksheet that previously existed when I started working for NISS. There was a standard method that was used for documenting these connections. Initially when I started work as a technician, there were different Excel or Access databases or spreadsheets that were used for different sites. Some time after I commenced work, NISS started using a cable management database software package called IT Links that I

believe was designed specifically for Citigroup. I used both the Excel and Access databases/spreadsheets to enter the data required (this was typically the location where the connection was provided, the type of device, ie. a printer, etc., the connection speed and the port to which the cables were connected). I also used the IT Links database for entering the same type of information. I did not develop any of these databases or spreadsheets. To the extent that I indicate in my resume that I created a database or worksheet, this means that if I was involved in a build-out at a new location for which a spreadsheet did not exist, I would use the existing template to create a new spreadsheet for the location. This did not involve any type of independent judgment or any type of database expertise. I simply followed procedures already established.

27.    With regard to the importance of documenting network connections, the database was very useful in assisting with troubleshooting connectivity issues. However, if a Citigroup employee reported a problem with his or her network connection, and the cables and hardware were not properly documented, it would involve physically following the cable to the connection point to ensure that you are testing the correct connection. For an individual user, a technician might take an extra 5 to 10 minutes to do this task in addition to the 30 to 40 minutes it might take if the connection was properly documented. There were regular instances of incorrect documentation in the databases and spreadsheets. In fact, it was inevitable with numerous technicians inputting information that mistakes would occur. With regard to an entire floor or building loosing network connectivity, I was not aware of this ever happening during my employment with Citigroup.

28.    To my understanding, the Engineering Department had complex redundancy plans so that if a connection went down that would affect an entire floor, there are webs of back-up connections to ensure that connectivity is maintained while the faulty connection is fixed. Without documentation to troubleshoot the issue, it would

take longer to correct the problem, but it would not involve an entire trading floor loosing connectivity and, as a result, potentially loosing millions of dollars from a delay. In fact, based upon my understanding, the more money at risk on a particular production floor, the more complex the redundancy plan. As a technician, I had to install the cabling for the back-up connections described which were designed by engineers.

29.    All of the physical cabling, network connectivity work that I performed was standard work with standard equipment based on procedures that were developed or created by others. There was little physical supervision that was required to ensure that the work was done correctly. There was either a network connection or there wasn't. If a Citigroup employee had no network connection, they would submit a request through one of the systems described above to troubleshoot the connection.

30.    In addition, my supervisor, Thomas Saranello performed spot checks of the cabling documentation to ensure accuracy. About once a month, he would randomly pick connections and check to make sure they are accurately documented. If not, he or a technician would correct the error. On any project involving more than a few end users, the technicians, including myself, relied on plans that were generated by others and reviewed by a number of different departments before finally being assigned to us. Any discretion that I ever used was minimal and not of an important nature. Any work I performed that had any importance connected to it was supervised and/or approved by my superiors.

31.     In my 2002 year-end performance evaluation, (Ex. 5), my supervisor, Mr. Saranello indicated that I was involved as the "lead" technician in various relocations and restacks. Being the lead technician essentially meant that I was the main technician performing the manual labor and documentation to set up network connections on the projects described. I was at no time assigned to supervise any other technicians, nor have I ever had other technicians report to me. There may have been other technicians working on these projects at certain points in time but they were working independently of me.

32.     Each of my year-end performance evaluations as a technician (2001, 2002, 2003) show that I had no managerial responsibilities. (2001 Year-end Evaluation is attached as Exhibit 9). (See also Exs. 5 and 6, section 3).

33.     The Defendants claim that in order to ensure port connectivity, I was required to understand virtual local area network ("LAN") configurations and how to match a network address to a port. Even though this was done on occasion by the technicians, it was a responsibility that fell to GNCC. It involved telneting to a router and performing a "Sharp" command. This was a standard task and we followed an established procedure to complete this work as set out in the PCM. (Ex. 1 ("NISS PCM") at 29-33).

34.     In his deposition, (Saranello Dep., at 39), Mr. Saranello testified that I used a micro scanner to test network connectivity. In fact, I never used a micro scanner myself (and don't include any reference to it in my resume). (Ex.8). I did assist in using one once or twice but typically used a Fluke meter which basically performed the same function and was a lot easier to use.

35.    In conjunction with my work as a technician, I was regularly required to do installations or troubleshoot network connectivity issues for a lab facility located on the 13th floor of 388 Greenwich Street, ("Greenwich Lab") the site to which I was assigned as a technician.  CTI's lab environments were established "for lifecycle testing and certifying standard technology solutions" prior to the new technology being recommended and installed throughout Citigroup.  (See, PCM for Global Engineering Lab ("GE PCM"), attached as Exhibit 10). The Global Engineering Department was in charge of the CTI lab facilities.

36.    Global Engineering had its own budget and was its own separate department. Every time a technician worked on network connectivity issues, Global Engineering was charged for the work, which came from its budget.  It was determined in 2003 that, instead of using a technician from NISS to troubleshoot network connectivity and install network devices, it would be more cost-effective for Global Engineering to hire a network technician to perform this work.  The position of Lab Coordinator was created.  I and the other technicians in my group were made of aware of this position in approximately December 2003 by my supervisor Mr. Saranello.

37.    It was represented as being a possible stepping stone into computer engineering.  However, the primary duties and responsibilities associated with the position were the same duties and responsibilities that I had as a technician in NISS.

38.    The change in position involved a change in title only.  It was not a promotion.  In fact, I discussed this matter with Yesim Akdeniz, the head of the Global Engineering Group after I transferred and she confirmed that my change of position was a lateral move and that I would not receive any additional money.  My

16

pay increase as a technician had already been determined for 2004 when I moved to Global Engineering.

39.    I reported to Paul Holder, Assistant Vice President and Senior Network Engineer from December 2003 until some time in 2006 when he transferred to another department within Citigroup. At the time I reported to Mr. Holder, he in turn reported to Amedeo Discepolo. Mr. Discepolo became my immediate supervisor when Mr. Holder transferred positions in 2006. Mr. Discepolo was the head of the Business Office at the time.

40.    As the Greenwich Lab was constantly evaluating new equipment and devices, the number of installations being performed was more numerous than on a typical production floor. Typically, the equipment being evaluated was kept for 3 or 6 months and then returned to the vendor.

41.    I was the sole technician responsible for installing all network hardware and cabling and troubleshooting for approximately three hundred engineers who worked in the Greenwich Lab. The volume of work on a daily basis to maintain network connectivity for the group was significant. In fact, my supervisors recognized this in my 2005 Year-End Performance Evaluation by describing my day-to-day responsibilities as "overwhelming". (See 2005 Year-End Review attached as Exhibit 11, at 3).

42.    I regularly worked in excess of 40 hours a week in this position and sometimes as many as 70 hours per week. (See extract from Citigroup's Time Recording Records, attached as Exhibit 12).

43.    In addition to the primary role of providing all the support for network connectivity, I had the following duties and responsibilities as Lab Coordinator as set out in the GE PCM. (Ex. 10 (GE PCM), at 5-6):

    a.    I was responsible for lab space allocation – this involved determining where new devices should be installed. There was no expertise involved in making this determination. It essentially involved deciding where there was enough physical space to house the equipment. It also involved determining the appropriate power provisioning, such as whether there was enough power available for the device and whether it exceeded the standard thresholds set. This was based on standards set by Engineering. An engineer was required to complete a request to procure equipment. Occasionally the request did not include the power requirement and I might have to call the vendor to find out the power requirement;

    b.    I was responsible for maintaining a record of who had physical access to the lab and issuing them with the appropriate security access card. I did not determine who had access. Access had to be approved by the Citigroup employee's superior and communicated to me. On a yearly basis, I would review the access information and make sure that it was accurate, ie. if any employee had left or moved to another department, I would remove him or her from my records;

    c.    I was responsible for Lab Coordination. This involved maintaining an inventory of equipment that was received by the Lab. The engineers determined which equipment to order and were the primary points of

contact with the vendors. They were also responsible for arranging equipment delivery and return. I would accept delivery and inventory the equipment. I would remove the equipment from the inventory when it was returned.

d.  I was also responsible, in conjunction with the various engineering teams and my supervisor Mr. Holder, for completing the annual insurance questionnaire for insuring the equipment. Basically, I used the inventory of equipment I maintained to fill in details with respect to what equipment the lab had, whether it was leased or owned and its value. Any information that I did not have to complete the questionnaire, I obtained from the engineers. I provided the draft to my supervisor for approval. I did not arrange for insurance, negotiate insurance rates, determine values or perform any other tasks associated with this other then the gathering and inputting of information that was available to me. I did not sign the form.

e.  When necessary, I acted as a "liaison" with the different engineering disciplines within the Greenwich Lab. This meant that if one engineering discipline was looking for information and I was aware that another discipline had the necessary information, I would advise the engineer of the appropriate party to consult with to obtain that information.

f.  I was the overall Greenwich Lab Caretaker. This meant that I was responsible for making sure the lab was neat and free of obstruction and that all of the cabling and equipment was properly documented.

g.  I was also responsible for "management segment" of the IP Address segment. This meant that I logged into an existing system called QIP which tracked IP addresses and assigned the next available IP address for the installation of a new server. I had no discretion in assigning numbers. The system did this automatically.

44.     As set out in the GE PCM, the Engineering Teams and Team Leads were responsible for the following: submitting lab requests detailing the work that needed completion; contacting the vendors regarding new or existing equipment; designing and configuring the Test Beds used for testing the new equipment (Test Beds are a specific configuration of software, hardware or both); responsible for VTM (Virtual Threat Management) and operational support on their team's devices; arranging delivery and return of equipment; paying for lab power modifications; responsible for "test segment" IP address management; responsible for software license maintenance. (Ex. 10 (GE PCM), at 5-6).

45.     I performed all of the above functions outlined in ¶44 on my own with supervision from my boss Mr. Holder for the first year and a half approximately of my employment in that position. Mr. Holder and I were located in the same building and interacted on a daily basis in connection with the performance of my duties.

46.     In April 2005, almost a year and a half after I commenced the position as Lab Coordinator, I prepared the first draft of the Process Control Manual for the Greenwich Lab ("GE PCM – 1st Draft", attached as Exhibit 13), in conjunction with Mr. Holder, Denise Pavone, David Young and Marcello Medina, members of Global Engineering and the Global Engineering Compliance Department. Similar to my

responsibilities in NISS as they related to the NISS PCM, I merely created a draft of the document based on instructions received from my superiors and wrote down details regarding procedures used in the Greenwich Lab. Once drafted, I circulated the GE PCM 1st Draft to my superiors for their review and approval. I did not have the ultimate authority to set or control procedures within the Greenwich Lab.

47.    Again, with regard my position as Lab Coordinator, I spend approximately 80 to 90 per cent of my time performing the manual work of installing equipment, running cables, testing network connectivity and configuring ports. The administrative duties involved in this position took up no more than 10 to 20 percent of my time. Basically, my primary duty – and mine alone – was to make sure that equipment was installed so that the engineers could test the products and ensure that all engineers had network connectivity. The volume (not the complexity) of my responsibilities was overwhelming. I regularly complained to my supervisor that additional help was needed to keep up with the requests from the engineers for installations.

48.    Some time in the latter half of 2005, another Lab Coordinator, Naseer Ibrahim, was hired to share those responsibilities. Mr. Ibrahim incidentally was also a technician in NISS prior to transferring to Global Engineering.

49.    After his transfer to the position of Lab Coordinator, I showed him the various procedures we used in the Lab for taking requests from engineers, tracking inventory, etc.

50.    Some time in 2005, it was decided that the Greenwich Lab, along with other Global Engineering Labs located in the tri-state area be consolidated and moved to a new lab facility in Warren, New Jersey ("Warren Lab"). Both Mr. Ibrahim and I were to move to the new location once the relocation was complete.

51.    A Project Manager from the Project Management Department, Angela Zaki, was assigned to coordinate and oversee the move to the Warren facility. After approximately six months, she resigned her position and was replaced by a consultant Project Manager Todd Waddell, who also left after approximately 6 months in the position. Much of the responsibility for the move fell to my immediate supervisor, Mr. Holder. In conjunction with the move, Mr. Holder assigned me certain tasks which I completed based upon his instruction.

52.    In connection with the Warren move, I performed the following tasks:

    a.   I put together inventories of equipment that needed to be moved based on information I gathered from the engineers. One person was assigned from each lab facility that was part of the move to gather the same information. I was the point person for collection and compilation of the total inventory;

    b.   I compiled a list of the types of technology services we would be requiring at the Warren Lab, i.e. phone service, internet service, etc.

    c.   I worked with Mr. Holder on putting together a project map for the move. Once approved by Mr. Holder, he requested that I input the project map into Project Manager software. I was not familiar with this software and Mr. Holder walked me through the steps involved in doing this.

    d.  I also compiled a list of equipment that was necessary to complete our

work once at the Warren Lab, such as cables, ports, switches, etc. and

reviewed this with Mr. Holder who approved it. I myself had no

purchasing power and could not authorize the purchase of any equipment.

This had to be approved by the Procurement Department.

53.    Mr. Holder designed the network for the Warren Lab with Maha Morsi from

Network Engineering. The Facilities Team designed the cabinet layout and frame

layout for the Warren Facility. The Facilities Team also designed the A/C and the

electrical. I assisted with this and in helping them identify how many ports there

would be per cabinet based on engineering standards.

54.    While performing these tasks associated with the relocation to Warren, I

continued to perform my day-to-day duties of supporting the network. These

responsibilities had not diminished and were central to my role as Lab Coordinator.

55.    In or around the beginning of 2006, Mr. Holder transferred to another position

within Citigroup. At the same time, Mr. Discepolo became my direct supervisor.

This was after the Greenwich Lab had relocated to the Warren Lab. I had weekly

meetings with Mr. Discepolo to review my work and Mr. Discepolo, in addition to an

office in Long Island, also maintained an office at the Warren Location. Aside from

seeing Mr. Discepolo on a weekly basis, we communicated by e-mail and by phone

on a regular basis with respect to my duties and responsibilities.

56.     With regard to my resume, (Ex. 8), I also provided bullet point descriptions of

the various tasks associated with my position as Lab Coordinator.  Again, these

descriptions are designed to as impressive as possible, but many of the tasks included

are basic responsibilities performed to established engineering standards.

57.     The following is a brief explanation of each bullet point contained on page 2

of my resume relating my position as Lab Coordinator:

a.  **Participated in the build out and daily operations of 6000 sq. ft. 1000+ device Lab/Development Data Center which services over 400 Research and Development Engineers**: This refers to the move to the Warren Lab and the work associated with the installation of devices and setting up network connectivity for those devices.

b.  **Participated and implemented Lab/Data Center:** This again relates to my installing equipment and establishing network connectivity in the Greenwich Lab, the Warren Lab and the Data Centers associated with those labs.

c.  **Consolidated/Migrated five major Citigroup Global Engineering labs to the Warren Facility mentioned above:** These were the duties and responsibilities I described above relating to the migration to the Warren Lab;

d.  **Participated in team of Data Center Support Technicians:** This relates to installation work I performed in the Data Center which supported the Greenwich Lab and the Warren Lab;

e.  **Evaluated all incoming testing efforts and built the proper environment or engaged the proper engineering discipline to assist in test effort:** Every request from an engineer in the lab for new equipment to be tested was processed through me.  I would review the request and follow-up with the engineer if there was any missing information that I needed to complete the installations and configuration.  If there was some task involved that I could not do, then I contacted the appropriate engineering discipline to get involved with setting up the test equipment;

f.  **Configured, maintained, documented and supported development network**: The development network housed all of the network connections for the lab servers. I did the same network support for this as previously described;

g.  **Upgraded Cisco IOS on routers and switches:** This was performed as part of the move to the Warren facility;

h.  **Managed network connectivity, implementation, integration and troubleshooting for servers, routers, and storage devices:** This relates to the performance of the manual labor involved in installing equipment, establishing network connectivity, documenting connectivity, and troubleshooting problems with connectivity;

i.  **Ordered and installed networking gear, servers, and lab supplies:** I had no authority to purchase any equipment for the lab. I would receive requests from the engineers and all orders had to be approved by the Procurement Department. I did put in orders for basic supplies needed for providing network connections, like cables, wire ties and cabinet brackets, but again, these orders needed to be approved by the Procurement Department;

j.  **Performed installations of the latest technology equipment for testing in Lab/Development Data Center in accordance with Citigroup Standards:** This related to the installation of the equipment that was being evaluated by the engineers. As indicated, I used standards that were set by the Engineering Department to install all of this equipment. I did not deviate from those standards;

k.  **Determined the placement and power provisioning of servers, network and storage devices for installation in Lab/Development Data Center:** This was one of my responsibilities as it related to the move to the Warren Lab. I did have some leeway in terms of where within the general plan this equipment needed to be placed. For example, I had to determine, based upon engineering standards, if there was enough power available. I also had to determine where in a cabinet to place certain devices based upon space available. I worked with the Facilities Team with regard to the layout;

l.  **Setup and configured console and KVM connections on all gear:** This means that I set up computer console, keyboard, video and mouse systems and named all of the ports;

m.  **Installed and configured all network connections for servers, SAN, and networking gear:** SAN is Storage Area Network. This involved the same type of installation work for establishing network connectivity as previously described;

n.  **Aggressively monitored, managed and resolved customer request and trouble tickets:** Again, this relates to all of the engineers requests coming

to me. I had to check each request, troubleshoot and ensure that the work was completed;

o. **Maintained connectivity and Data Center elevation databases:** This means that I documented all network connections in the appropriate databases when installation was complete;

p. **Utilized test equipment to ensure reliability of cabling and connectivity**: This refers to the same testing devices that I used in my position as a technician;

q. **Reviewed and scheduled all testing requests:** This is duplicative of n. above;

r. **Monitored power consumption, environmental issues and change control activities:** I consulted the appropriate teams within CTI, including the Facilities Group, to ensure that the standards for power consumption, etc. were not exceeded. The standards were set by these groups;

s. **Provided input for Development Data Center policies and communicated them to our engineers, teams, internal staff, business units and vendors:** This relates mainly to shipping procedures. Sometimes there were issues with how and to whom equipment was shipped in the lab. As I received shipments, I suggested certain protocols to be followed, like, all shipments should come to my attention. Also, I suggested that if a vendor or contractor was present at the lab, they needed to let me or Mr. Ibrahim know if they needed to unplug a device so that we had a record of it. I did not have the final say with regard to these policies.

58.     The amount of additional work that was created as a result of the move to the Warren Lab was significant. As stated above, the type of work I was assigned in connection with the move was limited to functions that involved very little exercise of discretion and any discretion I had related to relatively minor items. For example, consulting with Paul Holder regarding which tasks needed to be completed what dates to populate in the project plan. I did not exercise any independent judgment with respect to the tasks I performed in connection with the move. Ultimate responsibility for the move rested with my supervisor Mr. Holder and his supervisor Mr. Discepolo.

59.     As I still had all of my overwhelming day-to-day responsibilities associated with supporting the Greenwich Lab, I suffered from significant work-related stress.  I communicated with my supervisors on a regular basis regarding the stress associated with the move.  In fact, since commencing my position as Lab Coordinator, I advised Mr. Holder that there was far too much work for one support person to process.  Even after Mr. Ibrahim was hired, the volume of work was roughly equivalent to what four technicians would handle in the NISS group.  In addition, the amount of physical work associated with the move in terms of uninstalling, moving and reinstalling equipment and establishing network connectivity for more than a thousand devices at the Warren Lab was far more than the two of us could handle.  In fact, many of the engineers who relocated had to connect their own equipment or it would not have been connected.

60.     Two additional contract employees were hired on a six-month contract to assist with the move.  It was represented to me Mr. Holder and Mr. Discepolo that these employees would be retained on a full-time basis to support the Warren Lab after the move.  The Warren Lab was a combination of the Greenwich Lab and four other labs, was in excess of 6,000 square feet and involved more than 1000 devices that were exchanged/updated on a frequent basis.

61.     However, following the move to the Warren Lab and the expiration of their contracts, neither of the employees was retained and the responsibility for support of the Lab returned to me and Mr. Ibrahim.  There was an average of approximately 15 installations of devices per week and sometimes as many as 40 installations per week, a very significant number for two support technicians.  I was

extremely unhappy with this arrangement and made my opinions known to Mr. Discepolo. He explained to me that there were budget constraints and accordingly, they could not retain these two employees.

62.      Around the middle of 2006, because of the overwhelming volume of work and no prospects for it diminishing, the work-related stress I suffered resulted in my taking some time off work. I considered going out of work on disability but never did. In August 2006, I was issued a warning from Mr. Discepolo with regard to my time-keeping. I again communicated to him the issues involved with the overwhelming nature of the work to be performed at the Warren Lab. He advised me that nothing was going to change.

63.      Again in January 2007, I was issued with a warning regarding my time keeping. I had another conversation with Mr. Discepolo where it was evident that the status was not going to change with regard to my position. What had originally seemed like a potential stepping stone into work in the engineering field, ended up being essentially the same work I had performed as a technician for NISS, with some additional administrative tasks.

64.      On March 16, 2007, I tendered my resignation from Citigroup and advised my employers that my leaving was a result of work-related stress.

65.      Neither as a Telecommunications Analyst nor as a Lab Coordinator did I ever do any of the following:

     a .      write, design, create or modify computer programs or computer systems;

     b .      apply systems analysis techniques and procedures to determine

28

hardware, software, or system functional specifications;

c.   make determinations about hardware, software or system
     specifications that were required for a particular end user – the
     hardware that we used was standard;

d.   write new software (or modify an existing computer program) to
     solve a problem I was asked to deal with;

e.   design, develop, analyze, create, test or modify computer systems
     based on user or system design specifications.

Executed on this 14th day of March, 2008.

_C. Millan_

Carmelo Millan